**Verna Lee BURTON, Plaintiff and Appellant,**

v.

**Robert L. YOUNGBLOOD, M.D., Defendant and Respondent.**

No. 18929.

Supreme Court of Utah.

Aug. 9, 1985.

Loni DeLand, Salt Lake City, for plaintiff and appellant.

Stewart M. Hanson, Jr., Francis J. Carney, Salt Lake City, for defendant and respondent.

ZIMMERMAN, Justice.

Plaintiff Verna Lee Burton appeals from an order under Rule 41(b) of the Utah Rules of Civil Procedure dismissing her claim against Robert L. Youngblood, M.D. at the close of her case. She had alleged

that Youngblood was negligent in treating her and that he had not obtained her informed consent for the surgery at issue. On appeal, Burton seeks reversal on two grounds. First, she asserts that the trial court improperly excluded testimony by her expert witness concerning the appropriate standard of care and that if the evidence had been admitted, a Rule 41(b) motion would not have been appropriate regarding her negligence claim. Second, she contends that the court erred in granting the motion with respect to her other claim because the evidence shows that Youngblood did not disclose substantial and significant risks associated with the surgery, thus failing to satisfy the informed consent requirements of U.C.A., 1953, § 78–14–1 to –11 (1977 ed.). We reject both contentions.

On November 17, 1978, Youngblood, a board certified plastic surgeon, performed an upper eyelid blepharoplasty on Burton's left eyelid. During the surgery, he encountered excessive bleeding and responded by cauterizing the bleeding point. Following the surgery, Burton developed ptosis, or droopiness, of the left upper eyelid and was unable to fully close her left eye when she blinked. She also developed a painful infection of the left upper eyelid, which persisted for approximately two months. Youngblood treated the infection by draining the affected area and recommending that Burton apply hot packs to the eyelid. During this procedure, Youngblood noted scarring on the levator muscle, which raises and lowers the eyelid. Burton's eye became unusually dry causing the development of frequent and painful corneal ulcers. She also found it difficult to sleep, both because her eye would not completely close and because the artificial tears she used to moisten her eye gave her only temporary relief from the pain and irritation.

Youngblood continued to treat Burton's eye for about a year following the initial blepharoplasty. Dissatisfied with the lack of progress, she then consulted a number of other plastic surgeons and an opthalmologist. Dr. Steven T. Jackson, a board certified opthalmologist and ocular plastic surgeon who testified at trial as Burton's expert witness, operated on Burton twice to correct the ptosis. To date, however, residual difficulties continue and Burton is still unable to completely close her eye.

On January 30, 1981, Burton filed an action alleging that Youngblood negligently performed the blepharoplasty and that he failed to inform her of the possible consequences of the surgery. The matter was tried to a judge on November 17 and 18, 1982. Burton's case consisted of testimony from herself, Youngblood, and Dr. Jackson. When Burton rested, Youngblood moved to dismiss pursuant to Rule 41(b) alleging that Burton had failed to show that she was entitled to relief. The trial court granted the motion. In its findings, prepared pursuant to Rule 52(a), the trial court found that the medical testimony had not established to a reasonable degree of medical certainty that any aspect of Youngblood's care or treatment had fallen below the applicable standard of care or proximately caused Burton's injury. The court further found that medical testimony had not established that any substantial and significant risk remained undisclosed to Burton before the surgery. The court concluded that Burton had failed to establish a prima facie case either that Youngblood had been negligent or that he had failed to obtain her informed consent.

■ On appeal, Burton first argues that her expert witness, an ocular plastic surgeon, should have been allowed to testify as to the standard of care applicable to Youngblood, a general plastic surgeon who performed ocular surgery. She contends that because Youngblood performed surgery of a specialized nature, he ought to be held to the higher standard of care required of a specialist and about which her expert witness, who was just such a specialist, could testify. Burton interprets the trial court's ruling excluding the testimony of her expert as a pronouncement by the court that her witness and Youngblood represented two different schools of thought and that, as a matter of law, one could not

testify against the other. Had her expert's testimony not been excluded, Burton argues, she would have made out a prima facie case of negligence.[1]

Burton asserts that the trial court erred in excluding the testimony of her expert on the basis that he was not qualified to testify as to the standard of care required of Youngblood. It is true that, ordinarily, a practitioner of one school of medicine is not competent to testify as an expert in a malpractice action against a practitioner of another school. *Annot.,* 85 A.L.R. 2d 1022, 1023 (1962). In light of the wide variation between schools in both precepts and practices, as a general matter this rule makes good sense. It has been judicially adopted in a majority of states, *id.,* and we follow it here.

Burton does not ask us to depart from this general rule. Rather, she contends that the trial court did not recognize an applicable exception to that rule, *i.e.,* an expert witness belonging to one school may competently testify against a member of another school once sufficient foundation has been laid to show that the method of treatment—and hence the standard of care—is common to both schools. *Id.* at 1026. Burton argues that under this exception, a specialist plastic surgeon should be permitted to testify against a general plastic surgeon when the general plastic surgeon engages in surgery in the specialist's area.

We have no quarrel with this approach, nor did the trial judge, whose ruling Burton fundamentally misconstrues. The trial court did not hold that a member of one school cannot testify against a member of another school as a matter of law. It only held that under the facts of this case, the foundation necessary to allow a member of one medical specialty to testify about the standard of care applicable to a member of another medical specialty had not been established. This ruling is far narrower than

Burton assumes and is not contrary to the law as we understand it or as Burton perceives it.

Had Burton's counsel laid adequate foundation to establish that the preoperative, surgical, and postoperative methods governing blepharoplastic surgery were identical, regardless of whether the physician was a general or specialized plastic surgeon, then the requirements of the exception described above would have been fulfilled and the expert would have been free to testify. *See Caro v. Bumpus,* 30 Colo. App. 144, 491 P.2d 606, 607–08 (1971); *Gaston v. Hunter,* 121 Ariz. 33, 588 P.2d 326, 347 (App.1978). The dialogue between the court and counsel, preliminary to the court sustaining Youngblood's foundational objection, shows that the court plainly had both the general rule and the pertinent exception in mind:

The Court: Well, if there are two different schools of thought on how you do something, he's not qualified to testify about a different school of thought. I think you've got to establish that the two different kinds of specialists have the same standard before he can testify about it or that they would require the same things. If this witness knows that, I think he can testify about that, but if he doesn't know that, then I don't think he can. I think you've got to establish that for foundation.

Counsel for Plaintiff: If he is a more higher and more sophisticated and educated physician about this type of surgery, which I would proffer to the Court is not performed by all plastic surgeons under the category of plastic surgery, and plastic surgeons, per se, do not educate themselves on the necessary relevant material facts, maybe they ought not to be performing this surgery.

The Court: I agree with that. If this witness will testify that any doctor that does this procedure should know the fol-

---

1. Burton misapprehends the standard for granting a Rule 41(b) motion. While a court is certainly justified in granting a Rule 41(b) motion if the plaintiff does not make out a prima facie case, it may also grant such a motion where a prima facie case has been proven. *E.g., Wessel v. Erickson Landscaping Co.,* Utah, 711 P.2d 250 (1985).

lowing things no matter what kind of a doctor he is, that's admissible.

■ In response to this interchange, Burton's counsel tried to elicit from the expert witness a list of preoperative procedures for blepharoplastic surgery that would apply either to all medical doctors or to all board certified plastic surgeons. The witness, however, would only state that his information was based on personal training and experience, and that he did not have any list of procedures applicable to all doctors or all board certified plastic surgeons. At this point, Burton's counsel requested that his witness be qualified as an expert. When the court ruled that adequate foundation had not been laid, the attorney made a proffer as to what the witness would say and then went on to another line of questioning.

The witness's testimony was excluded, then, solely because Burton's counsel was unable to elicit the necessary foundation to establish that any plastic surgeon performing a blepharoplasty would employ the same methods and follow the same procedures as those he proposed to describe. Under the facts before us, we find no error in the court's ruling.

■ For her second point on appeal, Burton contends that the trial court erred in dismissing her claim for failure to obtain informed consent, as required by section 78–14–5(1) of the Code. The statute lists six factors that a patient must prove in order to recover damages from a health care provider.[2] Burton's challenge to the trial court's ruling rests entirely on her

assertion that Youngblood did not disclose to her "substantial and significant" risks associated with the surgery as required by subsection (e) of the statute. To support this assertion, Burton points only to her expert's enumeration of a list of "major" risks associated with blepharoplastic surgery, which included the possibility of ptosis. Burton argues that Youngblood's failure to inform her that ptosis could result established that Youngblood violated the informed consent statute and was liable for her injuries.

This argument fails because Burton misunderstands the requirements of the statute. This bare bones testimony may have been sufficient to prove that "the health care rendered carried with it a substantial and significant risk of causing the patient serious harm," as required by subsection (d). Standing alone, however, it was insufficient, to establish a prima facie case of failure to obtain informed consent.

■ To make out a prima facie case, Burton must show compliance with *all* of the statutory elements. No record evidence addresses the other essential elements of the claim, including whether Youngblood's alleged failure to disclose substantial and significant risks proximately caused Burton's injury. U.C.A., 1953, § 78–14–5(1)(g). Without such proof, no prima facie case of failure to obtain informed consent can be made out.

Affirmed.

HALL, C.J., and STEWART, HOWE and DURHAM, JJ., concur.

---

**2.** Section 78–14–5(1) provides in pertinent part:

For a patient to recover damages from a health care provider in an action based upon the provider's failure to obtain informed consent, the patient must prove the following:

(a) That a provider-patient relationship existed between the patient and health care provider; and

(b) The health care provider rendered health care to the patient; and

(c) The patient suffered personal injuries arising out of the health care rendered; and

(d) The health care rendered carried with it a substantial and significant risk of causing the patient serious harm; and

(e) The patient was not informed of the substantial and significant risk; and

(f) A reasonable, prudent person in the patient's position would not have consented to the health care rendered after having been fully informed as to all facts relevant to the decision to give consent. In determining what a reasonable, prudent person in the patient's position would do under the circumstances, the finder of fact shall use the viewpoint of the patient before health care was provided and before the occurrence of any personal injuries alleged to have arisen from said health care; and

(g) The unauthorized part of the health care rendered was the proximate cause of personal injuries suffered by the patient.