Rebecca Jane **CHADWICK**, Plaintiff and Appellant,

v.

Talmage **NIELSEN, M.D.**, Defendant and Respondent.

No. 880196–CA

Court of Appeals of Utah.

Nov. 2, 1988.

David R. Daines, Daines & Plowman, Logan, for plaintiff and appellant.

Stewart M. Hanson, Jr., Francis J. Carney, Suitter, Axland, Armstrong & Hanson, Salt Lake City, for defendant and respondent.

Before BENCH, BILLINGS and ORME, JJ.

## OPINION

ORME, Judge:

Chadwick appeals from the trial court's directed verdict terminating her medical malpractice action against Nielsen. Chadwick claims she established a prima facie case of medical malpractice and thus the trial court abused its discretion in granting the directed verdict. She also claims the trial court's denial, on the morning of trial, of her motion to amend her complaint was an abuse of discretion. We find no reversible error in either action and affirm the trial court's disposition of the case.

## FACTS

On September 13, 1979, plaintiff Rebecca Chadwick contacted defendant Dr. Talmage Nielsen, a vascular surgeon, to discuss potential medical treatment to alleviate pain she was experiencing in her left leg. Nielsen examined Chadwick and concluded a varicose vein was causing her pain. He suggested a saphenous phlebectomy, which would entail the surgical removal of the vein from Chadwick's leg. Chadwick insisted on having a phleborheogram ("PRG"), a test used to determine if one's veins and circulatory system are functioning properly, before she agreed to the proposed surgery. Chadwick insisted on the PRG because she believed extensive surgery she had undergone as an infant might have damaged the inner vein system in her left leg. Chadwick felt such damage would detract from the feasibility of surgically removing the varicose vein.

Chadwick informed Nielsen of her previous surgery and he obtained and reviewed her medical records. Nielsen then sent a letter to Dr. John Daines, Chadwick's uncle, indicating that "to be certain that there is no obstruction [in the vein system] a phleborheogram will be obtained" and "a standard saphenous phlebectomy ... will be planned if the deep system is normal as anticipated."

The PRG was performed on September 14, 1979 and Nielsen immediately obtained the written PRG report. The technician who prepared the PRG report had placed a checkmark in the column indicating the circulation in Chadwick's left leg was "abnormal." Nielsen discussed the written results with the technician and concluded that only a minor circulatory problem existed which did not alter his professional opinion that the phlebectomy should be performed. Nielsen informed Chadwick that the PRG results were "good" and he performed the surgery on September 19, 1979.

Chadwick consented to the surgery without asking for the written test results.

The leg continued to bother Chadwick after the surgery and the pain became debilitating. She filed a medical malpractice action against Nielsen on May 4, 1984, nearly five years after the surgery. Nielsen prepared his defense through the usual discovery procedures. He took Chadwick's deposition, requested production of documents, and served requests for admission. Chadwick apparently conducted no discovery whatsoever. While she complied with Nielsen's discovery requests, she did not take Nielsen's deposition, serve any interrogatories, nor request any documents.

Nielsen filed a Certification of Readiness for Trial on February 5, 1985. Chadwick did not object. Pursuant to Utah Code Ann. § 78–12–47 (1987), a bifurcated trial began on March 26, 1985, to first consider if Chadwick's action was barred by the four-year medical malpractice statute of limitation, Utah Code Ann. § 78–14–4 (1987),[1] with a trial on the merits to follow if necessary. Having not asked for a copy of the PRG report while contemplating surgery, during the several year period following surgery, or in the course of discovery, Chadwick saw the written PRG report for the first time at the statute of limitation trial when Nielsen referred to it in the course of his testimony. Chadwick subsequently moved to amend her complaint to allege, among other things, "intentional concealment" by Nielsen of the risks related to the surgery. The motion to amend was heard by the trial court on April 16, 1985, the morning of the trial on the merits, and was denied as being untimely. Chadwick then proceeded to try the merits of her case under her original complaint.

Despite previous suggestion by the trial court that she engage an expert, Chadwick did not call a medical expert to testify in

---

1. After considering the applicability of § 78–14–4 at the first trial, the court ruled that Chadwick's claims would not be barred if she could prove the "continuing negligence" of Nielsen. *See Peteler v. Robinson*, 81 Utah 535, 17 P.2d 244, 248 (1932) (where continuing negligence occurs, statute of limitation does not begin to run until the end of treatment). Thus, the court correctly allowed Chadwick to pursue her claims through a trial on the merits but reserved its ruling on the applicability of the statute of limitation until the relevant facts had been established.

support of her claims, although she did question Nielsen as a hostile witness. At the conclusion of Chadwick's case, the trial court directed a verdict for Nielsen. The trial court reasoned that expert medical testimony was necessary for Chadwick to establish a prima facie case based on the claims in her complaint. Alternatively, the trial court held that Chadwick's claims were barred by the medical malpractice statute of limitation, Utah Code Ann. § 78–14–4 (1987).[2]

Chadwick appeals the denial of her motion to amend her complaint and the directed verdict.

## DENIAL OF CHADWICK'S MOTION TO AMEND

■ Leave to amend a pleading is a matter within the broad discretion of the trial court and we do not disturb its ruling unless appellant establishes an abuse of discretion resulting in prejudice. *Girard v. Appleby,* 660 P.2d 245, 248 (Utah 1983). *See Staker v. Huntington Cleveland Irrigation Co.,* 664 P.2d 1188 (Utah 1983); *Westley v. Farmer's Ins. Exchange,* 663 P.2d 93 (Utah 1983). Generally, leave to amend is liberally allowed in the interest of justice, but justice is often uninterested in amendments alleging new and different causes of action on the eve of trial. *See Staker,* 664 P.2d at 1190; *Girard,* 660 P.2d at 248; Utah R.Civ.P. 15(a). The amendment of pleadings on the eve of trial causes great disruption to the legal process and is unfair to an opponent who has conducted discovery, fully prepared the case, and scheduled trial time based on the moving party's prior pleadings.

■ Nonetheless, there are certainly occasions where justice excuses untimeliness. A motion to amend raised shortly before or at trial, in response to facts discovered subsequent to the prior pleading, should be allowed if there is a reasonable explanation for the delay in discovering the facts and the amendment is not unduly prejudicial to the opposing party. *Girard,* 660 P.2d at 248.

■ In this case, we cannot say the trial court abused its discretion in denying Chadwick's motion to amend her complaint on the morning of trial. Although Chadwick's proposed amendment was not a model of clarity—it consisted of only 11 numbered paragraphs without delineating specific causes of action—given a generous reading, it makes these allegations beyond those of the original complaint: (1) Chadwick was not informed of the substantial and significant risks of the surgery and (2) Nielsen knowingly concealed those risks from Chadwick. Chadwick argues that the belated amendment to add new causes of action was justified due to the recent discovery of the written PRG results.

■ It was, however, Chadwick's failure to conduct even rudimentary discovery which caused the written PRG results to go unnoticed until Nielsen produced them during his testimony. The untimeliness of Chadwick's motion to amend could have been avoided had she undertaken even the most fundamental discovery. "Boilerplate" requests for all documents in Nielsen's possession concerning her treatment would have turned up the report early in the proceeding. An untimely motion to amend is inappropriate where the only excuse for its untimeliness is the moving party's failure to conduct discovery.[3] *See Girard,* 660 P.2d at 248 (a party seeking to amend a pleading the morning of trial must have an adequate reason for the motion's untimeliness or it will be denied); *Svoboda v. Trane Co.,* 495 F.Supp. 367, 373 (E.D. Mo.1980), *aff'd* 655 F.2d 898 (8th Cir.1981)

**2.** In light of our conclusion, we need not decide—and therefore do not address—whether Chadwick's complaint was barred by the statute of limitation.

**3.** Chadwick argues that the rules do not require a party to conduct discovery and thus the failure to do so should have no effect on her right to amend her complaint. While we agree that discovery is in a sense optional, the failure to conduct discovery is not without consequence. *See, e.g., Ault v. Dubois,* 739 P.2d 1117, 1122–23 (Utah Ct.App.1987) ("A surprise at trial which could have been easily guarded against by use of available discovery procedures may not serve as a ground for a new trial.").

(motion for leave to amend will be denied where moving party has conducted no discovery and opponent has completed discovery and case is ready for trial); *Mercantile Trust Co. Nat'l Ass'n v. Inland Marine Prod. Corp.*, 542 F.2d 1010, 1013 (8th Cir.1976) (a "leisurely approach to discovery" caused the deficiency in the pleadings and it is not an abuse of discretion to deny amendment on those grounds); *Span East Airlines, Inc. v. Digital Equip. Corp.*, 486 F.Supp. 831, 835 (D.Mass.1980) (leave to amend will be denied where moving party conducted no previous discovery, opponent had completed discovery based on original pleadings, and motion to amend was filed one day before opponent's motion for summary judgment was to be argued).

Having concluded the denial of Chadwick's motion to amend was not an abuse of discretion, we address the propriety of the directed verdict in light of Chadwick's original complaint and the evidence she presented. We review the record on appeal in a light most favorable to Chadwick to determine whether a prima facie case was established. *Wilderness Bldg. Systems, Inc. v. Chapman*, 699 P.2d 766, 768 (Utah 1985).

## THE DIRECTED VERDICT

■ Chadwick's original complaint against Nielsen asserted claims for medical malpractice relating to the surgery and treatment following surgery, and the failure of Nielsen to achieve the "guaranteed" results. (The latter claim was dismissed on Nielsen's motion for summary judgment, an action which is not assailed on appeal.) We affirm the trial court's directed verdict

due to Chadwick's failure to present expert medical testimony.[4]

■ In order to sustain a medical malpractice prima facie case, a plaintiff must establish the following elements: (1) the standard of care by which the doctor's conduct is to be measured, (2) breach of that standard by the doctor, and (3) injury proximately caused by the doctor's negligence. *See, e.g., Schmidt v. Intermountain Health Care, Inc.*, 635 P.2d 99, 101 (Utah 1981). Due to the technical and complex nature of a medical doctor's services, expert medical testimony must be presented at trial in order to establish the standard of care and proximate cause—except in unusual circumstances. *See Robinson v. Intermountain Health Care*, 740 P.2d 262 (Utah Ct.App.1987); *Smith v. Shannon*, 100 Wash.2d 26, 666 P.2d 351 (1983); *Getchell v. Mansfield*, 260 Or. 174, 489 P.2d 953, 955 (1971). For example, "expert testimony is unnecessary to establish the standard of care owed the plaintiff where the propriety of the treatment received is within the common knowledge and experience of the layman." *Nixdorf v. Hicken*, 612 P.2d 348, 352 (Utah 1980).

We agree with the trial court that the *Nixdorf* exception does not apply here and, by failing to present expert testimony, Chadwick failed to establish her prima facie case. The *Nixdorf* exception can be fully understood only in light of its facts. The doctor in *Nixdorf* lost a cutting needle inside his patient's body and then failed to disclose this fact. The Utah Supreme Court held that jurors could determine the standard of care the doctor was required to

---

4. The lack of expert medical testimony would likewise have been fatal to the claims newly raised by the proposed amended complaint. The amended complaint sought to allege a claim for lack of informed consent as a result of Nielsen's failure to disclose the PRG test results. The better reasoned cases from other jurisdictions hold that, at a minimum, expert testimony is required in cases alleging a lack of informed consent to prove the materiality of the risk involved. *See Tiedemann v. Radiation Therapy Consultants*, 299 Or. 238, 701 P.2d 440, 447 (1985) (informed consent relating to radiation treatment requires expert testimony and plaintiff failed to establish prima facie case by only

presenting lay testimony); *Smith v. Shannon*, 100 Wash.2d 26, 666 P.2d 351, 356 (1983) (expert testimony in informed consent cases is necessary to prove materiality of information not disclosed and the existence of a risk, its likelihood of occurrence, and the possible type of harm); *Bloskas v. Murray*, 646 P.2d 907, 914 (Colo.1982) (in informed consent cases, the precise scope of the doctor's duty to disclose must be determined by expert testimony); *Charley v. Cameron*, 215 Kan. 750, 528 P.2d 1205, 1210 (1974) (medical expert testimony is ordinarily necessary to establish that disclosure was insufficient given the practices of reasonable medical doctors under like circumstances).

follow without expert medical testimony because it is common knowledge that reasonable medical practitioners do not leave surgical instruments inside their patients' bodies and then keep it a secret. The Court noted that expert testimony would shed little light on the "propriety of the treatment" the *Nixdorf* plaintiff received. 612 P.2d at 352–53.

Conversely, the standard of care applicable to a vascular surgeon in the removal of veins is not within the common knowledge and experience of laypersons. The "propriety of the treatment" Chadwick received from Nielsen simply cannot be determined without expert testimony. Even though the PRG results indicated the blood flow in Chadwick's leg was "abnormal," Nielsen's interpretation of those results, and his subsequent medical judgment based thereon, can only be challenged by a medical expert. The only expert testimony in this case was Nielsen's, which was, predictably, altogether unhelpful to Chadwick's position. By failing to offer contrary expert medical testimony, Chadwick failed to establish a prima facie case of medical malpractice.

■■■ Chadwick also misinterprets the scope of the *Nixdorf* exception. That exception expressly obviates the need for expert testimony only in establishing the standard of care and breach of that standard by the doctor. The medical malpractice plaintiff must still ordinarily provide expert testimony, as did the *Nixdorf* plaintiff, to establish that the doctor's negligence proximately caused plaintiff's injury. *Nixdorf,* 612 P.2d at 354 n. 17. *See Anderson v. Nixon,* 104 Utah 262, 139 P.2d 216, 220 (1943). In other words, while it may be common knowledge that a reasonable medical practitioner would not leave a needle in a patient's body, it requires expert testimony to establish that the lost needle is causing, for example, plaintiff's headaches.

■■■ We also reject Chadwick's alternative claim of error concerning the lack of expert testimony. Chadwick asserts that the trial court should have permitted Chadwick's father, an electrical engineer with expertise in fluid mechanics, to give expert testimony as to the hydraulic principles of venous blood transportation. We think the trial court properly excluded this testimony. It may be that many general scientific principles apply to both fluid mechanics and the human circulatory system. Nonetheless, we think it is sound policy to limit expert testimony in medical malpractice cases to that which is within the doctor's specific field of practice. *See Burton v. Youngblood,* 711 P.2d 245, 248 (Utah 1985) ("practitioner of one school of medicine is not competent to testify as an expert in a malpractice action against a practitioner of another school"). As an example, even though both are medical doctors, an ocular plastic surgeon is not competent to testify in a medical malpractice action against a general plastic surgeon who performed eyelid surgery. *Burton,* 711 P.2d at 249. To adopt Chadwick's position, although its creativity is acknowledged, would allow geologists to give expert testimony as to the appropriate principles to be employed in the extraction of gallstones. We think such a result would not enhance justice in medical malpractice cases.

## CONCLUSION

Chadwick's motion to amend her complaint was properly denied by the trial court on the morning of trial as its untimeliness was without justification. A trial court does not abuse its discretion in denying an untimely and prejudicial amendment where the moving party's untimeliness is attributable to its failure to conduct discovery. The trial court was also correct in granting a directed verdict as Chadwick failed to establish a prima facie claim of medical malpractice due to the lack of supporting expert medical testimony. The trial court's disposition is accordingly affirmed.

BILLINGS and BENCH, JJ., concur.