**James T. DIKEOU and Helen K. Dikeou, individually and as the natural parents and heirs of the estate of Theodore "Ted" James Dikeou, deceased, Plaintiffs and Appellants,**

v.

**Jeffrey S. OSBORN; Michael D. Dowdall, M.D.; and HCA Health Services of Utah dba St. Mark's Hospital, Defendants and Appellee.**

No. 930182–CA.

Court of Appeals of Utah.

Sept. 1, 1994.

**944**

Jackson Howard, Fred D. Howard, and Leslie W. Slaugh, Provo, for appellants.

David H. Epperson and Jaryl L. Rencher, Salt Lake City, for appellee.

Before DAVIS, GREENWOOD and JACKSON, JJ.

## OPINION

GREENWOOD, Judge:

Plaintiffs, James T. and Helen K. Dikeou, the natural parents and heirs of the estate of Theodore "Ted" Dikeou, appeal the trial court's grant of summary judgment in favor of defendant, Dr. Jeffrey S. Osborn. We affirm.

## BACKGROUND

Dr. Osborn is a board certified cardiologist who had treated Ted Dikeou since 1988. Mr. Dikeou suffered from a moderately common condition known as Wolff–Parkinson–White Syndrome, which is the existence of an abnormal heart beat. On the evening of February 21, 1990, Mr. Dikeou called Dr. Osborn and reported that his heart was beating very fast, probably as the result of a change in asthma medications. Dr. Osborn suggested that Mr. Dikeou lie down for an hour to see if his accelerated heart beat would subside without further treatment. Mr. Dikeou called Dr. Osborn back later that same evening and reported that his condition had not improved. Dr. Osborn advised Mr. Dikeou that he needed a routine injection to slow his rapid heart beat. Mr. Dikeou stated that he wished to go to St. Mark's Hospital Emergency Room, which was near his home, to have his condition checked and receive the necessary treatment. Dr. Osborn informed Mr. Dikeou that he did not have staff privileges at St. Mark's, but did not counsel Mr. Dikeou against going to St. Mark's. After Mr. Dikeou arrived at St. Mark's, Dr. Michael D. Dowdall, the emergency room physician, telephoned Dr. Osborn and reported that Mr. Dikeou was experiencing a heart rhythm identified as paroxysmal atrial tachycardia (PAT). After exchanging additional information, Dr. Osborn told Dr. Dowdall that he thought the appropriate treatment for PAT would be a "conservative medical approach of IV Verapamil." Although Dr. Osborn suggested to Dr. Dowdall a proposed treatment for Mr. Dikeou, Dr. Osborn made no effort to independently confirm or modify Dr. Dowdall's underlying diagnosis of PAT. The diagnosis was, in fact, incorrect and the treatment and medication prescribed and administered to Mr. Dikeou by Dr. Dowdall exacerbated his condition, ultimately resulting in Mr. Dikeou's death.

Mr. Dikeou's parents, James and Helen Dikeou, brought suit against St. Mark's Hos-

pital, Dr. Dowdall, and Dr. Osborn.[1] Dr. Osborn moved the court for summary judgment and the Dikeous responded. They based their response primarily on the affidavit of Dr. J. Fred Bushnell, a licensed emergency room physician.[2] Dr. Osborn moved to strike the affidavit of Dr. Bushnell on the grounds that it lacked foundation and was based on hearsay. Dr. Osborn's criticism of the affidavit stemmed from his position that Dr. Bushnell, as a licensed emergency room physician, could not testify "as to the standard of care required of a physician specializing in cardiovascular diseases and electrophysiology." The trial court granted Dr. Osborn's motion to strike Dr. Bushnell's affidavit and also granted Dr. Osborn's motion for summary judgment. The Dikeous appeal the trial court's decision.

## ISSUES

■ The Dikeous raise three issues on appeal. First, they assert the trial court improvidently granted summary judgment inasmuch as the affidavit of Dr. Bushnell creates a factual issue concerning Dr. Osborn's negligence and establishes that Dr. Bushnell is knowledgeable regarding the standard of care applicable to Dr. Osborn. Second, the Dikeous assert that the trial court should not have granted summary judgment based on their technical noncompliance with Rule 4–501 of the Utah Code of Judicial Administration.[3] Finally, the Dikeous argue that the trial court erroneously allowed Dr. Osborn to bolster the trial court record after the trial court had already made its decision regarding summary judgment.[4]

## STANDARD OF REVIEW

■ Summary judgment is proper only when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *Allen v. Ortez*, 802 P.2d 1307, 1309 (Utah 1990). "Because summary judgment by definition does not resolve factual issues, a challenge to summary judgment presents for review only questions of law. We review those conclusions for correctness, according no particular deference to the trial court." *Transamerica Cash Reserve, Inc. v. Dixie Power & Water, Inc.*, 789 P.2d 24, 25 (Utah 1990); *accord Mountain Fuel Supply Co. v. Salt Lake City Corp.*, 752 P.2d 884, 887 (Utah 1988). In determining whether the trial court correctly concluded that there was no genuine issue of material fact, we view the facts and inferences to be drawn therefrom in the light most favorable to the losing party. *Hamblin v. City of Clearfield*, 795 P.2d 1133, 1135 (Utah 1990).

## ANALYSIS

### Medical Expert Testimony and Determination of Applicable Standard of Care

■ The Dikeous complain that the trial court inappropriately disqualified their medi-

1. The Dikeous settled with Dr. Dowdall and St. Mark's Hospital and thereafter stipulated to a dismissal with prejudice of all claims against them.

2. The Dikeous also designated Dr. Michael D. Lesh, a licensed cardiologist, as an expert witness. The record does not reveal why the Dikeous relied on Dr. Bushnell, rather than on Dr. Lesh, to establish the applicable standard of care for Dr. Osborn, a licensed cardiologist.

3. As the first issue asserted by the Dikeous is dispositive of this case on appeal, we do not address the Dikeous' second procedural argument regarding technical noncompliance with Rule 4–501(2). *See State v. Carter*, 776 P.2d 886, 888 (Utah 1989).

4. The thrust of the Dikeous' third argument is to criticize the trial court's grant of Dr. Osborn's motion to supplement the record, after the trial court had already granted summary judgment, with the Dikeous' responses to Dr. Osborn's and St. Mark's interrogatories. Specifically, the Dikeous assert that these interrogatory answers were not used by the trial court in deciding summary judgment yet are now part of the record for review by this court. We do not address this argument, or the related procedural arguments, for two reasons. First, the trial court noted, and our review of the record confirms, that the interrogatory responses added to the record after the trial court's summary judgment order duplicated information already in the record. Thus, the trial court did have this information before it, and we could review it on appeal. Second, even if the supplemental information were not duplicative, this court is well aware of its responsibility to review a trial court's grant of summary judgment using only the information on file at the time the trial court granted the motion. Thus, any error by the trial court connected to this issue, actual or perceived, did not prejudice the Dikeous' case below and does not taint our review of the trial court's ruling.

cal expert whose affidavit the Dikeous submitted to establish the relevant standard of care. The trial court's summary judgment ruling stated:

> Dr. Bushnell is not an expert in the same area of practice as Dr. Osborn. Further, an examination of his opinion clearly reveals a lack of foundation and is also clearly based on hearsay. Even given a presumption of the ability to rely on hearsay to an expert's testimony said affidavit does not meet the criteria required to enable him to be able to testify as to the standard of care required for a physician specializing in the same specialty as Dr. Osborn.

Dr. Bushnell is a specialist in emergency room medicine, whereas Dr. Osborn is a specialist in cardiology. Despite this obvious difference, the Dikeous argue on appeal that Dr. Bushnell is well-qualified to testify as to the applicable standard of care.[5] They insist that the appropriate standard of care in this case is a general one involving the relationship between a patient's regular physician and an emergency room physician. Accordingly, the Dikeous argue, they do not need a cardiologist's expert testimony to establish the proper standard of care.[6]

This court has underscored the three elements that any plaintiff must establish to sustain a prima facie case of medical malpractice: "(1) the standard of care by which the doctor's conduct is to be measured, (2) breach of that standard by the doctor, and (3) injury proximately caused by the doctor's negligence." *Chadwick v. Nielsen,* 763 P.2d 817, 821 (Utah App.1988). A plaintiff's failure to present evidence that, if believed by the trier of fact, would establish any one of the three prongs of the prima facie case justifies a grant of summary judgment to the defendant.

◾ The seminal case in Utah on the first element—standard of care—is *Burton v. Youngblood,* 711 P.2d 245 (Utah 1985).[7] In

---

5. In a letter submitted to this court under Rule 24(j) of the Utah Rules of Appellate Procedure, the Dikeous cited the case of *Daubert v. Merrell Dow Pharmaceuticals,* —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) as supplemental authority relevant to the instant case. We have reviewed *Daubert* and find it unpersuasive for two reasons. First, the case involves the interpretation of the Federal Rules of Evidence and is therefore persuasive but not controlling precedent in this court. Second, *Daubert* involved the "*Frye*" or "general acceptance" test which has been the "dominant standard for determining the admissibility of novel scientific evidence at trial" for the past 70 years. *Id.* at ——, 113 S.Ct. at 2792. The *Daubert* court held that the Federal Rules of Evidence replaced the *Frye* test, allowing federal trial courts to admit evidence based solely on its relevance and reliability. *Id.* at ——, 113 S.Ct. at 2795. The Dikeous thus ask us to extend the rationale of *Daubert* to the instant case by allowing their expert to testify, despite the differences in standards of care between emergency room and cardiology physicians, because Dr. Bushnell's testimony would be "relevant" and therefore helpful to a jury, as required by the Utah Rules of Evidence. However, the Utah Rules of Evidence also require relevant evidence to be excluded when its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Utah R.Evid. 403. It appears to us that the Utah Supreme Court's rationale underlying the *Youngblood* and *Arnold* decisions, analyzed later in the main body of this opinion, is to assure that relevant expert medical testimony given to establish the applicable standard of care maintains a high degree of reliability, thereby avoiding confusion for a jury. Thus, we are not persuaded in this case by the reasoning of *Daubert.*

6. The Utah Supreme Court noted in *Nixdorf v. Hicken,* 612 P.2d 348 (Utah 1980), that medical expert testimony is not required to establish the applicable standard of care when "the medical procedure is so common or the outcome so affronts our notions of medical propriety that expert testimony is not required to establish what would occur in the ordinary course of events." *Id.* at 353. In *Nixdorf,* a doctor left a surgical needle inside his patient at the conclusion of an operation. Under the unique facts of *Nixdorf,* it was obvious to lay people and doctors alike that doctors should remove surgical needles from their patients after an operation.

In the instant case, however, the facts and related medical procedure are not "so common" as to avoid the need for expert testimony. Despite the Dikeous' claim that a "general" standard of care applies in this case, we believe that the rule pronounced in *Youngblood* and *Curtis,* discussed infra, requires that the expert testimony be from a doctor who is either already in the specialty or familiar beforehand with the applicable standard of care peculiar to the medical specialty of the alleged negligent doctor.

7. Because we affirm the trial court's ruling based on the Dikeous' failure to establish the appropriate standard of care, we do not address the remaining two *Nielsen* elements necessary to establish a prima facie case for medical malpractice. *See Chadwick v. Nielsen,* 763 P.2d 817, 821 (Utah App.1988).

*Youngblood,* the Utah Supreme Court stated, regarding medical expert witnesses and applicable standards of care:

It is true that, ordinarily, a practitioner of one school of medicine is not competent to testify as an expert in a malpractice action against a practitioner of another school. In light of the wide variation between schools in both precepts and practices, as a general matter this rule makes good sense. It has been judicially adopted in a majority of states, and we follow it here.

*Id.* at 248 (citations omitted). In a later case, the supreme court, while noting the general rule that "[p]ractitioners in one specialty are not ordinarily competent to testify as experts on the standard of care applicable in another specialty," clarified the exception to the general rule stated earlier in *Youngblood:*

An exception is made when a witness is knowledgeable about the standard of care of another specialty or when the standards of different specialties on the issue in a particular case are the same.

*Arnold v. Curtis,* 846 P.2d 1307, 1310 (Utah 1993). Thus, according to *Youngblood* and *Arnold,* a medical expert witness brought in to testify on the applicable standard of care, and whose specialty differs from that of the allegedly negligent doctor, must show that he or she is knowledgeable about the applicable standard of care or that the standard of care in the expert's specialty is the same as the standard of care in the alleged negligent doctor's specialty.

In the present case, Dr. Bushnell's affidavit contains the following statements concerning his familiarity with the applicable standard of care:

8. I have reviewed the medical records on Theodore James "Ted" Dikeou from the private practice of Jeffrey S. Osborn, M.D., and from St. Mark's Hospital Emergency Room for the treatment rendered to Ted Dikeou on the night of February 20–21, 1990.

9. I have also read transcripts of the depositions of Mrs. Helen Dikeou, Dr. Jeffrey S. Osborn and Dr. Michael D. Dowdall.

10. Having read and studied the documents listed above, *I have formed a profes-*

*sional opinion as to the standard of medical care applicable in this case* and whether Doctors Osborn and Dowdall adhered to that standard of care in their treatment of Ted Dikeou.

Dr. Bushnell's statement that he "formed a professional opinion" after reviewing the documents does not meet the *Youngblood* standard or the exception to that standard clarified in *Arnold.*

 The trial court is given discretion under Rule 702 of the Utah Rules of Evidence "'to determine the admissibility of expert testimony, and to determine if the [expert] witness is qualified to give an opinion on a particular matter.'" *Robb v. Anderton,* 863 P.2d 1322, 1326 (Utah App.1993) (quoting *Anton v. Thomas,* 806 P.2d 744, 746 (Utah App.1991)). In exercising that discretion, we believe a trial court should require a medical expert witness to demonstrate familiarity with the applicable standard of care based on more than just a review of the documents in the particular case. *See Arnold,* 846 P.2d at 1310; *Youngblood,* 711 P.2d at 248. By definition, an expert is one who possesses a significant depth and breadth of knowledge on a given subject. To allow a doctor in one specialty, retained as an expert witness, to become an "expert" on the standard of care in a different medical specialty by merely reading and studying the documents in a given case invites confusion, error, and a trial fraught with unreliable testimony. *See Nielsen,* 763 P.2d at 822 ("[W]e think it is sound policy to limit expert testimony in medical malpractice cases to that which is within the doctor's specific field of practice.").

Therefore, as Dr. Bushnell's specialty is not the same as Dr. Osborn's, Dr. Bushnell must establish that he was knowledgeable before being retained as an expert witness about the standard of care in Dr. Osborn's specialty of cardiology or that the standard of care for emergency room physicians is the same as cardiologists. Dr. Bushnell failed to establish in his affidavit that he had sufficient knowledge regarding the appropriate standard of care prior to his review of the documents. Furthermore, he has not established that the standard of care for emergency

948

room physicians is the same as for cardiologists. Accordingly, we affirm the trial court's decision that summary judgment was appropriate in this case; the Dikeous failed to establish a prima facie case of medical malpractice because they presented no reliable testimony to establish the appropriate standard of care.

## CONCLUSION

The Dikeous failed to establish a prima facie case of medical malpractice. The trial court correctly ruled to strike the affidavit of the Dikeous' medical expert because he was not a specialist in the same area as Dr. Osborn and did not adequately demonstrate that he was either familiar with the appropriate standard of care or that the standard of care in his specialty area was the same as the standard of care in Dr. Osborn's specialty area. Additionally, any error by the trial court in supplementing the record after entry of its summary judgment order was harmless. Accordingly, we affirm the trial court's grant of summary judgment to Dr. Osborn.

DAVIS and JACKSON, JJ., concur.