1999 UT 71

R. Lane BOICE, deceased, By and Through Jolynn BOICE, his personal representative, Plaintiff and Appellant,

v.

Stephen P. MARBLE, M.D.; Healthsouth of Utah, Inc., dba Western Rehabilitation Institution, Inc., nka Healthsouth Rehabilitation Hospital of Utah; Ann Fjelsted, R.N.; John M. Sanders, M.D.; IHC Hospitals, Inc, dba Cottonwood Medical Center and LDS Hospital; and John Does 1 through 10, Defendants and Appellee.

No. 970124.

Supreme Court of Utah.

April 2, 1999.

As Amended Aug. 3, 1999.

Rehearing Denied Aug. 6, 1999.

Douglas G. Mortensen, Salt Lake City, for plaintiff

Jaryl L. Rencher, Stephen W. Owens, Salt Lake City, for defendant

ZIMMERMAN, Justice:

¶1  R. Lane Boice ("Boice") asks this court to reverse the trial court's grant of summary judgment in favor of Dr. Stephen P. Marble ("Marble"). Boice filed a medical malpractice action against Marble, alleging Marble caused or contributed to Boice's loss of use and function of his left wrist, hand, and fingers. The trial court granted summary judgment in Marble's favor, finding that Boice failed to present expert testimony of a doctor sharing Marble's specialty to establish the elements of Boice's negligence claim. We find that Boice presented sufficient testimony to create a triable issue of fact and reverse.

¶2  On September 19, 1992, Boice fractured his neck and herniated a cervical disc in a recreational accident. As a result of this injury, Boice lost use of his legs but maintained almost full use of both arms and hands. Dr. John M. Sanders ("Sanders") performed cervical spinal surgery on Boice the day after Boice's injury. Sanders performed an anterior cervical dissectomy and fusion at the c6–7 level and also inserted a bone plug in Boice's cervical spine. Following surgery, Sanders placed Boice in a hard cervical collar to stabilize and protect his neck. On September 24, 1992, Sanders discharged Boice. Boice was then transferred to Western Rehabilitation Institute ("WRI") under Marble's care. The next day, Marble removed Boice's hard cervical collar and replaced it with a Philadelphia collar. A Philadelphia collar is constructed of Styrofoam, which "gives" and does not completely immobilize its wearer's neck.

¶3  On September 26, 1992, at WRI, Boice was transferred from his bed to a wheelchair that had a reclining back. During the course of the transfer, the wheelchair's back fell abruptly, causing Boice to drop suddenly backward and to the left. The fall caused Boice to experience "electricity-type pain," radiating into his left side and toward both arms, wrists, and hands. X-ray films were taken but did not conclusively show whether the incident had compromised the surgical repair of Boice's spine. On the following day, Boice was taken to Cottonwood Hospital, where additional x-rays were taken. Dr. Sanders, who performed Boice's spinal surgery, examined Boice and noted "a new contusion of [Boice's] cord at the same c6–7 level." Boice was transferred back to WRI. A few days later, Marble noted a significant neurologic change in Boice's left wrist, hand, and fingers. Boice could no longer extend his left hand—a condition known as "wrist drop." Marble diagnosed the wrist drop as resulting from an injury to

Boice's radial nerve and not from reinjury of his spinal cord. Marble did not, however, order any x-rays. Dr. Sanders again examined Boice on October 14, and recommended an MRI on Boice's upper extremities. Both the MRI and x-rays taken the following day undoubtedly indicated a "severe" c6–7 subluxation. Boice underwent another surgery on his cervical spine, yet he did not regain use of his left wrist, hand, and fingers.

¶ 4 Boice filed this medical malpractice action against Marble and others on March 30, 1995, claiming that Marble caused or contributed to the loss of use of his left wrist, hand, and fingers. On April 25, 1996, Boice filed his designation of experts, which included as experts Dr. Bruce Y. Newton, a physiatrist;[1] Dr. Robert C. Cantu, a neurosurgeon; and Colleen A. Lowe, a registered nurse specializing in rehabilitative nursing. However, on November 18, 1996, Dr. Newton informed the parties that he no longer intended to testify as an expert witness. On November 27, 1996, approximately two months before the scheduled trial date of February 3, 1997, Boice filed a motion for leave to designate a substitute expert. At a hearing on December 13, 1996, Boice proposed that the court allow Dr. Jayne E. Clark, also a physiatrist, to testify on the standard of care for physiatry. In a minute entry dated December 20, 1996, the trial court denied the motion to substitute the new expert. In the pre-trial conference on January 22, 1997, Boice informed the trial judge that Clark would be Boice's treating physician at the time of trial. In a ruling from the bench, the trial judge stated that he would allow Clark to testify as a fact witness, but not as an expert witness. On January 30, 1997, in a written order, the trial court reaffirmed its denial of plaintiff's motion to find and designate a substitute expert. Furthermore, in a combined summary judgment and orders issued on March 3, 1997, the court explained that it denied plaintiff's motion to designate and offer testimony from the new

expert, Dr. Clark, since "she was not timely designated in the matter."

¶ 5 Previously, on December 20, 1996, Marble had filed a motion for summary judgment. In opposition, Boice filed the affidavits of Dr. Cantu and Nurse Lowe. Marble moved to strike the affidavits. In the joint summary judgment and orders, on March 3, 1997, the trial court granted Marble's motion to strike. The court reasoned that since Boice did not have an expert witness of Marble's specialty to testify about the standard of care of a physiatrist, the elements of plaintiff's medical malpractice claims were not established. *See Burton v. Youngblood,* 711 P.2d 245, 248 (Utah 1985). Therefore, summary judgment was granted for Marble. The other defendants settled with Boice on the day of trial. Boice then filed this appeal.

¶ 6 On appeal, Boice argues that the trial court erred in (i) denying his motion to designate a substitute expert witness on the standard of care of a physiatrist, (ii) prohibiting Boice's treating physiatrist, Dr. Clark,[2] from testifying as an expert at trial, and (iii) striking the Cantu and Lowe affidavits. Boice argues that each of these three rulings led the court to erroneously grant summary judgment for Marble. We first address the court's rulings related to expert testimony and then, given our conclusions on those issues, review the trial court's grant of summary judgment. We begin with the trial court's denial of Boice's motion to substitute a new expert.

¶ 7 The trial court held a scheduling conference on April 23, 1996, directing Boice to designate his experts by April 29. The court also ordered the parties to conclude discovery by October 15, 1996, and set trial for February 3, 1997. After Boice's designated physiatry expert decided not to offer expert testimony in mid-November, Boice moved within eight days to designate a substitute expert. Boice wanted to use Dr. Jayne E. Clark, a doctor who is board certified in physical medicine and rehabilitation,

---

1. A physiatrist is a physician specializing in physical medicine, rehabilitation, and nonsurgical spine care.

2. While Dr. Jayne E. Clark was not Boice's treating physician at the time the motion for leave to designate a substitute expert was filed, Boice would have been under Dr. Clark's care at the time of trial.

as his physiatry expert. The trial court denied Boice's motion on the grounds that Dr. Clark was not timely designated. Whether a trial court has erred in granting or denying a motion to designate a substitute expert is a legal question, which we review for correctness; however, we afford a trial court very broad discretion in ruling on such a motion. *Cf. Arnold v. Curtis*, 846 P.2d 1307, 1309–10 (Utah 1993); *State v. Pena*, 869 P.2d 932, 938 (Utah 1994). To evaluate the trial judge's decision, we first set out its context.

¶ 8 The trial court set a deadline date for designating expert witnesses pursuant to rule 16 of the Utah Rules of Civil Procedure. Rule 16 gives the trial judge broad authority to manage a case and provides, among other things, that courts may establish formal dates for "the completion of outstanding discovery" and "the identification of witnesses." Utah R. Civ. P. 16(b)(3), (6). If a party fails to obey a date set under rule 16, the court may sanction the offending party by excluding evidence the party intends to present. *See id.*[3]

¶ 9 In *Arnold v. Curtis*, 846 P.2d 1307 (Utah 1993), this court addressed the effect of a party's failure to obey an expert witness designation deadline set pursuant to rule 16. The plaintiff in *Arnold* alleged that her obstetrician failed to timely diagnose an adenocarcinoma of her bowel. *See id.* at 1308. The obstetrician moved for summary judgment, supported by an affidavit of an obstetric, gynecology, and gynecologic oncology specialist. *See id.* Arnold opposed the summary judgment with an affidavit of a physician specializing in general surgery. *See id.*

The defendant argued that the general surgeon was not qualified to testify about the appropriate standard of care. Plaintiff Arnold then filed the affidavit of another expert, a specialist in obstetrics, whom Arnold had *not* previously designated as an expert. *See id.* This filing occurred approximately three months after the expiration of the time for designating experts. *See id.* The defendant objected to the court's consideration of the second, non-designated expert's testimony because the plaintiff failed to comply with the time set for designating experts. We upheld the trial court's exclusion of the expert's testimony because the plaintiff filed the expert affidavit late and never asked the court to excuse the late designation. *See id.* at 1309–10.

¶ 10 Our decision in *Arnold*, however, recognizes that there are circumstances in which changes to a scheduling order are warranted: "While scheduling orders should never be so inflexible as to not accommodate exigencies that may occur, they are necessary to expedite the flow of cases through the court system and should not be lightly disregarded." *Id.* But unforeseen circumstances do arise. On occasion, justice and fairness will require that a court allow a party to designate witnesses, conduct discovery, or otherwise perform tasks covered by a scheduling order after the court-imposed deadline for doing so has expired. We believe that this case presents such a circumstance.

¶ 11 Boice had designated a physiatry expert, Dr. Bruce Newton, before the court's deadline expired. Boice proceeded

---

3. Rule 16 provides:
   If a party fails to obey a scheduling or pretrial order, ... the court, upon motion or its own initiative, may make such orders with regard thereto as are just, and among others, any of the orders provided in Rule 37(b)(2)(B), (C), (D). In lieu of or in addition to any other sanctions, the court shall require the party or the attorney representing him or both to pay the reasonable expenses incurred because of any noncompliance with this rule, including attorney fees, unless the court finds that the noncompliance was substantially justified or that other circumstances make an award of expenses unjust.
   Utah R. Civ. P. 16(b).
   Rule 37(b)(2) provides the following sanctions:

(B) an order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting him from introducing designated matters in evidence;
(C) an order striking out pleadings or parts thereof, staying further proceedings until the order is obeyed, dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party;
(D) in lieu of any of the foregoing orders or in addition thereto, an order treating as a contempt of court the failure to obey any orders except an order to submit to a physical or mental examination....
Utah R. Civ. P. 37(b)(2)(B), (C), (D).

with his case on the assumption that Newton would testify. Unlike the plaintiff in *Arnold*, Boice did not "fail[ ] to obey a scheduling or pretrial order." Utah R. Civ. P. 16(d). Rather, Boice sought leave to substitute a new expert only after Newton, his previously designated expert, decided at the last minute not to testify.[4] Moreover, Boice moved to substitute witnesses before the postponed discovery cut-off date,[5] two months before the scheduled trial date, and before defendants took depositions of three of Boice's witnesses. Marble argues that allowing Boice to substitute a new expert would have unfairly prejudiced him because he would not have enough time to depose Boice's substituted expert and prepare a defense against the expert's opinions at trial. However, even if it were true that Marble could take depositions of three other witnesses before trial but not of the new expert, the trial court could have obviated any prejudice by granting a motion for continuance. Rule 40 of the Utah Rules of Civil Procedure allows a court to postpone a trial "upon good cause shown."[6] Utah R. Civ. P. 40(b). In addition, the trial

4. Marble argues that Boice never intended to use Newton as an expert on liability and causation issues. The record belies that assertion. For example, a number of letters sent from Boice's counsel to defendants indicate Boice's intention of using Newton as a liability and causation expert. On October 11, 1996, Boice's counsel stated: "In March of 1995 ... I shared with you reports, diagnostic studies and opinions of medical experts including Drs. Cantu and Newton.... In short, you have all had the benefit of knowing for a long time the opinions of the experts *I have asked to review this case.*" Moreover, in Boice's Answers to Interrogatories of Defendant Sanders, dated March 11, 1996, Boice specifically stated that he intended to call Newton to testify "[a]s to Plaintiff's claim that the Defendants or one or more of them are liable for his injury." On May 21, 1996, Boice's counsel sent defendants another letter wherein he outlined Newton's findings and opinions; the letter also informed defendants that "Newton has necessarily become familiar with [Boice's] medical history and has reviewed [his] pertinent medical records."

5. Boice filed his motion to designate a substitute expert on November 27, 1996. Although this date was after the original discovery cut-off date, Sanders had earlier, on October 15, 1996, asked the court to extend discovery cut-off for 45 days. At a hearing held on December 20, 1996, the court heard argument on Sanders's motion to extend discovery cut-off. The parties argued that extension of discovery had already been acquiesced to by the parties inasmuch as depositions were scheduled to be taken after the original cut-off date. Boice's attorney maintained that he was waiting for responses to interrogatories, that he might need to take additional depositions of Sanders's experts, and that defendants wished to depose Dr. Newton, Boice's expert. In a minute entry dated the same day, the court granted the extension "as agreed upon;" he offered no further elaboration of what was agreed upon. Presumably, the court intended to extend discovery for all of the purposes discussed at the hearing.

Counsel for Marble attended and participated in this hearing and was thus well aware that the discovery cut-off had been extended, at the very least for some purposes, including defendants' deposing some of Boice's witnesses. Because the court subsequently granted the extension of the discovery cut-off, the parties had until November 29, 1996, to complete discovery. In his brief to this court, counsel for Marble stated that Boice sought to substitute a new expert "10 weeks *after* the discovery cut-off." This statement by counsel for Marble was technically true, because it was after the original discovery cut-off. However, it was misleading because the original cut-off had been extended at least for some purposes. The same is true of the statement of facts in Marble's brief, where it is represented that "plaintiff did not file a motion ... to depose a new expert until November 27, 1996, more than a month and a half after the discovery cut-off." These factual assertions are troubling because counsel for Marble relies heavily in his brief on Boice's asserted tardiness in seeking to designate a substitute expert as a basis for urging us to sustain the trial court's rejection of Boice's request. While Marble's counsel may have honestly believed that the discovery extension did not apply to his client or did not affect Marble, it did apply to counsel for Boice, the party Marble's counsel asserts acted tardily. For that reason, counsel for Marble had an obligation to candidly inform this court of the fact that the trial court was permitting some discovery to continue after the initial cut-off and after it denied Boice's request. *See* Rule 3.3(a)(1) of the Utah Rules of Professional Responsibility.

While Justice Howe finds these statements unimportant and therefore not "misleading," they might have been outcome-determinative. Had we accepted as true counsel for Marble's statements, we might not have found that the trial court abused its discretion when it denied Boice's motion to designate a substitute expert.

6. In fact, rule 40 specifically provides for postponement for lack of evidence: "If the motion is made upon the ground of the absence of evidence, such motion shall also set forth the materiality of the evidence expected to be obtained and shall show that due diligence has been used to procure it." Utah R. Civ. P. 40(b).

It seems that Boice was not planning on making a motion for continuance, and there is no

court, acting under either rule 16 or rule 40, could have required Boice to pay Marble for the expense of deposing the new expert, costs for expediting the deposition process, and the like. Given the unexpected nature of Newton's withdrawal, and considering all the other surrounding circumstances, we conclude that the trial court abused its discretion in excluding Boice's substitute expert's evidence.

¶ 12 We also conclude that the trial court erred in prohibiting Dr. Jayne E. Clark from testifying as an expert at trial. After Dr. Newton referred Boice to Clark, Clark signed an affidavit on December 12, 1996, stating that she intended to examine Boice.[7] On January 6, 1997, Clark examined Boice. At the pre-trial conference, on January 22, 1997, Boice notified the court that at the time of trial Dr. Clark would be Boice's treating physician. Furthermore, on January 28, 1997, Clark sent Newton a fourteen page letter providing detailed findings and opinions about Boice's injuries and condition and thanking him for referring Boice to her. Both Boice and Marble said in their expert designation reports that they reserved the right to call as experts any of Boice's treating physicians. Boice's expert designation, for example, stated that "[p]laintiff may call other medical professionals who provided care to Plaintiff from September 19, 1992 *to the date of the trial ....*" (Emphasis added). Likewise, Marble's designation stated that "Dr. Marble anticipates that he may call several of the treating health providers to Mr. Boice to provide testimony in the form of opinions regarding causation, injuries, and damages...." Because both Boice and Marble reserved the right to call *any* of Boice's treating medical providers, both faced the possibility of having the other party call any medical provider who treated Boice prior to the trial as an expert. For both of these reasons, we conclude that the trial court erred in denying Boice's motion to call Clark as an expert.

¶ 13 As an additional claim of error, Boice argues that the trial court erred in striking the Cantu and Lowe affidavits filed in opposition to Marble's summary judgment motion. The trial court struck the affidavits because it concluded that neither medical provider was competent to testify about the appropriate standard of care for someone in Marble's specialty.

¶ 14 We first address the Cantu affidavit. The trial court struck Dr. Cantu's affidavit because it concluded that Cantu was not qualified to testify about the standard of care for a physiatrist. Boice states that he submitted Cantu's affidavit to establish that Marble breached his duty in providing post-surgical follow-up care to Boice. An expert witness belonging to one school may testify against a member of another school once the expert provides sufficient foundation to show that the method of treatment at issue is common to both schools or that the expert is knowledgeable about the standard of care of the other school. *See Burton v. Youngblood,* 711 P.2d 245, 248 (Utah 1985), *cited in Arnold v. Curtis,* 846 P.2d 1307, 1310 (Utah 1993).

¶ 15 In *Burton v. Youngblood,* 711 P.2d at 247, the plaintiff claimed that a general plastic surgeon negligently performed a blepharoplasty, a type of eye surgery. The plaintiff sought to introduce the expert testimony of an ocular plastic surgeon and the trial court excluded it. We affirmed the trial court's exclusion, not because the two physicians were of different schools, but because the ocular plastic surgeon did not provide the necessary foundation "to establish that any plastic surgeon performing a blepharoplasty would employ the same methods and follow the same procedure as those [the ocular plastic surgeon] proposed to describe." *Id.* at 249. Under this principle, we conclude the trial court erred in striking Cantu's affidavit. Boice, unlike the *Burton* plaintiff, provided sufficient foundation to show that the method of treatment at issue—post-operative care of a spinal cord injury victim—is the same for a

---

evidence that Marble made such motion either. If the trial court allowed for a substitution of a new expert, it could have conditioned that grant on a continuation of the trial to give all sides time to adequately prepare.

7. Boice's counsel had a copy of that affidavit delivered to Marble's counsel on the following day.

neurosurgeon, like Cantu, or a physiatrist. And he provided the foundation that the standard of care for a physician providing post-operative treatment to a patient recovering from spinal cord surgery is the same whether the physician was a neurosurgeon or a physiatrist. Cantu's affidavit stated:

I have performed the very type of surgery which was performed on Lane Boice's cervical spine in September of 1992. I have also provided follow-up care and treatment to patients who have had such surgery. Post-surgery care of patients who have sustained cervical spinal injury is sometimes provided by the neurosurgeon who performed the surgery and sometimes provided by a physiatrist or other specialist. . . . The standard of care expected of the attending physician for a post-surgery cervical spine injury patient who is not in the immediate post-operative period but has entered the rehabilitative phase is the same whether the attending is a neurosurgeon, neurologist, orthopedist or physiatrist. The method of treating the patient is the same regardless of the specialty in which the treating physician has been trained.

We conclude that the Cantu affidavit satisfied the test set out in *Burton*.

¶ 16 Marble asserts that it would be inequitable to allow Cantu to testify as an expert because Cantu previously stated he would not testify as to a physiatrist's standard of care. In making this argument, Marble relies on the form of Cantu's testimony and overlooks its substance. During Cantu's deposition, counsel for Marble took great care to ask Cantu specific questions about his knowledge of a physiatrist's standard of care. In doing so, however, Marble's counsel overlooked areas where a neurosurgeon's and physiatrist's practices overlap and areas where a neurosurgeon is well-qualified to testify. Although Cantu did state in his deposition that he would not testify about the standard of care of a physiatrist, he also offered opinions on and testified about his expertise in post-operative surgical care. Counsel for Marble and counsel for Boice even discussed Boice's intent to use Cantu as an expert against Marble. During Cantu's deposition, Marble's counsel implied that Cantu could not testify against Marble because Cantu is not a physiatrist. Boice's counsel maintained that Cantu could indeed testify against Marble. He stated: "By the time I get through with my questions of Dr. Cantu you will see how he can answer your questions the way he has [about a physiatrist's standard of care] and still provide very useful information that might continue to implicate Dr. Marble." After reading Cantu's entire deposition, and not just the simple refusal of Cantu to testify about "the standard of care of a physiatrist," we conclude that Marble should have been well aware that Cantu intended to offer expert testimony about the standard of care as it related to Marble's post-surgical treatment of Boice.

¶ 17 Boice next argues that the trial court erred in striking nurse Lowe's affidavit. We disagree. As we have explained under *Burton*, an expert affidavit must provide sufficient foundation to show that the expert is qualified to testify as to the standard of care. Lowe is an advanced-practice registered nurse specializing in rehabilitative care for victims of spinal cord injury. Although Lowe is well-qualified in rehabilitative care, her affidavit lacks the necessary facts to establish that the standard of care for a registered nurse specializing in rehabilitative care is the same for a physician providing post-operative care. Because Lowe's affidavit did not provide the necessary foundation to establish her competency to testify about Marble's standard of care, we affirm the striking of her affidavit.

¶ 18 We now address the ultimate issue in this case: whether the trial court erred in granting Marble's summary judgment motion. A trial court may grant summary judgment only if the moving party shows that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Utah R. Civ. P. 56(c). In reviewing a grant of summary judgment, we review the facts in the light most favorable to the nonmoving party. *See Jensen v. IHC Hosp., Inc.,* 944 P.2d 327, 339 (Utah 1997). In this case, the trial court granted Marble's motion for summary judgment because it concluded that

Boice "failed to properly present expert testimony as required by law (of one sharing Dr. Marble's specialty) willing to establish the requisite elements of plaintiff's claim against Dr. Marble." Since we have found that the trial court erred in striking the Cantu affidavit and denying Boice's motion to substitute a new expert, we conclude that the grant of summary judgment was erroneous. If the trial court had considered expert testimony from either Cantu or Clark, it could not have granted summary judgment because either doctor's testimony raised a material issue of fact. For example, Cantu's affidavit stated:

> Dr. Marble's failure to conform to the standard of care expected of a physician providing post-surgery rehabilitative follow-up care to Lane Boice was a significant contributing cause of Mr. Boice's permanent left wrist, hand and finger impairments. Dr. Marble's substandard care was, in my opinion, a substantial factor in causing the permanency of such impairments.

In short, Cantu presented admissible testimony that Marble had a duty in providing post-surgical care to Boice, that Marble breached that duty, and that Marble's breach was a significant cause of Boice's impairment.

¶ 19 The trial court erred in granting Marble's motion for summary judgment.[8] The court should have permitted Boice to substitute a new expert and allowed Dr. Jayne E. Clark to testify as an expert at trial. Likewise, the court erred as a matter of law in concluding that Cantu was not qualified to offer expert testimony against Marble and therefore erred in striking Cantu's affidavit. We reverse and remand for further proceedings consistent with this opinion.

¶ 20 Associate Chief Justice DURHAM and Justice RUSSON concur in Justice ZIMMERMAN's opinion.

HOWE, Chief Justice, concurring and dissenting:

¶ 21 I concur except I do not subscribe to the characterization in footnote five of the statement in Marble's brief that Boice sought to substitute a new expert "10 weeks after the cut-off" date as being "misleading." At another place in that same brief, Marble acknowledged that some depositions were taken after the discovery cut-off date.

¶ 22 While the first above-mentioned statement in Marble's brief was not a wholly accurate statement of the facts since the cut-off date had been extended for at least some purposes, the statement is of no consequence in the context of this case and therefore is not "misleading." What is important and material is that Boice's motion to substitute a new expert came seven months after the cut-off date for the parties to designate their expert witnesses. This deadline had not been extended and was controlling on the substitution of experts—not the cut-off date of discovery.

¶ 23 Justice STEWART concurs in Chief Justice HOWE's concurring and dissenting opinion.

---

8. Because we reverse summary judgment based on the trial court's error in excluding expert testimony, we do not reach Boice's other arguments on appeal.