2013 UT App 173

## THE UTAH COURT OF APPEALS

DONALDA DE ADDER,
Plaintiff and Appellant,
*v.*
INTERMOUNTAIN HEALTHCARE, INC.,
Defendant and Appellee.

Opinion
No. 20110709-CA
Filed July 11, 2013

Fourth District, Provo Department
The Honorable David N. Mortensen
No. 060401688

Randy S. Kester, Attorney for Appellant
Stuart H. Schultz, Suzette H. Goucher, and
Peter J. Baxter, Attorneys for Appellee

JUDGE STEPHEN L. ROTH authored this Opinion, in which
JUDGES J. FREDERIC VOROS JR. and MICHELE M. CHRISTIANSEN
concurred.

ROTH, Judge:

¶1     Donalda De Adder appeals from the grant of summary judgment in favor of Intermountain Healthcare, Inc. (IHC). We affirm.

BACKGROUND

¶2     De Adder underwent total right knee replacement in March 2004 at an IHC facility. Prior to surgery and for two days post-operation, De Adder did not have any symptoms of damage to her right peroneal nerve or of palsy, also referred to as "drop foot" or "foot drop," in her right foot. On the third day following surgery, however, De Adder began complaining of pain in her right lower

extremity. De Adder's orthopedic surgeon, Dr. Richard Taylor Jackson, diagnosed permanent damage to the right peroneal nerve and palsy to her right foot.[1] Dr. Jackson concluded that the damage resulted from the use of a continuous passive motion (CPM) device[2] that he had ordered as therapy for De Adder's knee following surgery. De Adder sued IHC, alleging that its nurses were negligent in monitoring, managing, and maintaining the CPM device. De Adder designated Dr. Jackson as her only expert witness regarding the post-operative standard of care required of nurses attending a patient receiving CPM therapy following total knee replacement surgery, the breach of that standard by IHC's nurses, and how the breach caused De Adder's injuries.

---

1. As the district court recognized, there was a genuine issue about whether and when De Adder showed signs of foot drop, but the district court "determine[d] that the presence or non-presence of the foot drop is not material to the motion upon the basis brought forward." The parties do not challenge the court's assessment, and accordingly, we treat it as a nonmaterial dispute, accepting, for purposes of appeal, De Adder's position that she did not experience any foot drop until three days post-surgery, *see Black v. Allstate Ins. Co.*, 2004 UT 66, ¶ 9, 100 P.3d 1163 (explaining that "[i]n reviewing a grant of summary judgment, an appellate court views the facts in a light most favorable to the losing party" (citation and internal quotation marks omitted)).

2. CPM is a type of physical therapy commonly ordered following knee surgery. It is "[a] technique in which a joint, usually the knee, is moved constantly in a mechanical splint to prevent stiffness and to increase the range of motion." Random House, Inc., *Dictionary.com Unabridged*, *available at* http://dictionary.reference.com/browse/continuous+ passive+motion (last visited June 27, 2013). CPM is carried out by "a machine that is used to move a joint without the patient having to exert any effort." Jonathan Cluett, *CPM - Continuous Passive Motion*, ABOUT.COM (June 15, 2009), http://www.orthopedics.about.com/od/hipkneetreatments/g/cp m.htm.

¶3    IHC moved for summary judgment. In its supporting memorandum, IHC argued that expert testimony was essential to a negligence claim of this sort and that De Adder had "failed to produce expert testimony that [IHC] breached the standard of care." *See generally Jensen v. IHC Hosps., Inc.*, 2003 UT 51, ¶ 96, 82 P.3d 1076 ("To prove medical malpractice, a plaintiff must establish (1) the standard of care by which the [health care provider's] conduct is to be measured, (2) breach of that standard by the [provider], (3) injury that was proximately caused by the [provider's] negligence, and (4) damages." (citation and internal quotation marks omitted)). Specifically, IHC contended that Dr. Jackson could not provide the required expert testimony because he does not practice in the same specialty as the nurses and his deposition testimony did not otherwise establish a sufficient foundation to admit his testimony about the standard of care applicable to the nursing staff. *See id.* ("[T]he plaintiff is required to prove the standard of care through an expert witness who is qualified to testify about the standard.").

¶4    De Adder opposed IHC's summary judgment motion with a Verified Expert Report from Dr. Jackson, which she attached to her response. Dr. Jackson stated, "I am familiar with the standard of care required of surgeons, assistants, post surgery nursing and physical therapy care required [to] perform and manage a successful result from [joint] surgeries." According to Dr. Jackson, this standard of care "requires [attendant hospital personnel] to tim[el]y observe and detect malfunctioning, misplacement or any failure of the CPM machine" through "diligent monitoring of complaints of pain, discomfort and unusual symptoms." Dr. Jackson expressed his opinion, "[t]o a reasonable degree of medical certainty," that De Adder's "injury occurred as a result of the failure of attendant hospital personnel to properly monitor the post operative condition of [her] right lower extremity" because De Adder's "injury resulted from prolonged pressure of the peroneal nerve by an element of the CPM machine." Dr. Jackson further opined that De Adder's injury could have been prevented "had attendant hospital personnel acted within the standard of care

regarding monitoring the use of the CPM machine, both function and timing."

¶5    At the hearing on the summary judgment motion, the district court admitted into evidence all of Dr. Jackson's affidavit statements pertaining to the standard of care and his opinions regarding the cause of De Adder's injuries. The court also received, upon the parties' stipulation, a copy of Dr. Jackson's entire deposition. Finally, the court allowed De Adder to supplement the record with Dr. Jackson's post-operative order for CPM therapy.

¶6    In a subsequent written order, the district court granted summary judgment in favor of IHC on the basis that Dr. Jackson was "not qualified to testify as an expert against [IHC] because he is not knowledgeable about the standard of care" that applies to the nurses who cared for her. The court explained that although a doctor might be competent to testify about the standard of care applicable to a nurse under certain circumstances, Dr. Jackson could not do so here because his verified expert report and deposition testimony failed to establish either that the standard of care for a nurse was the same as for an orthopedic surgeon or that Dr. Jackson otherwise had substantial knowledge of the standard of care required of a nurse providing CPM therapy.[3] De Adder now appeals.

---

3. Following the grant of summary judgment, De Adder filed a motion to amend the judgment, in which she asserted that the court had erroneously applied the law of summary judgment. The district court heard argument and denied that motion. In her notice of appeal, De Adder indicates that she is challenging the court's ruling on the motion to amend as well as its summary judgment decision. In her briefing to this court, however, De Adder does not address the denial of her motion to amend, other than as background for her summary judgment claim, and we therefore do not consider it as a separate matter. Because it raises the same issues as the grant of summary judgment in favor of IHC, it is unlikely that our consideration of De Adder's motion to amend would yield a different result on appeal.

ISSUES AND STANDARDS OF REVIEW

¶7    De Adder contends that the district court abused its discretion in determining that Dr. Jackson's testimony was inadmissible to establish the nursing standard of care, thereby rendering the grant of summary judgment inappropriate. Specifically, De Adder asserts that "the trial court, under the guise of a summary judgment proceeding, conduct[ed] a factual determination as to the adequacy of Dr. Jackson's credentials to testify as to the standard of care applicable to [the] nurse." She claims the court did this by "initiat[ing] its own [Utah] Rule [of Evidence] 702 examination" in the absence of a motion and briefing on the issue and without conducting a formal hearing.

¶8    "We first address the court's rulings related to the expert testimony and then, given our conclusions on those issues, review the trial court's grant of summary judgment." *Boice ex rel. Boice v. Marble*, 1999 UT 71, ¶ 6, 982 P.2d 565. "The trial court has wide discretion in determining the admissibility of expert testimony . . . . Accordingly, we disturb the district court's decision [not to admit] expert testimony only when it exceeds the limits of reasonability." *Eskelson ex rel. Eskelson v. Davis Hosp. & Med. Ctr.*, 2010 UT 59, ¶ 5, 242 P.3d 762 (citations and internal quotation marks omitted). Summary judgment is appropriate only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Utah R. Civ. P. 56(c). We therefore review a court's summary judgment ruling for correctness. *State ex rel. School & Inst. Trust Land Admin. v. Mathis*, 2009 UT 85, ¶ 10, 223 P.3d 1119.

ANALYSIS

I. The District Court's Rulings on the Admissibility of Dr. Jackson's Testimony

¶9    IHC's motion for summary judgment challenged Dr. Jackson's qualifications to present expert testimony regarding the

standard of care for nurses using the CPM device on the basis that Dr. Jackson is an orthopedic surgeon with "no training or experience as a nurse" or any experience with operating or monitoring the CPM device. The district court agreed with IHC and excluded Dr. Jackson's testimony. Ordinarily, because of the district court's discretion in this area, we afford the court considerable latitude in determining the admissibility of expert testimony. *Eskelson*, 2010 UT 59, ¶ 5. De Adder, however, contends that the court's determination of Dr. Jackson's qualifications involved impermissible fact finding at the summary judgment stage of proceedings. Therefore, we are presented with a threshold issue of whether the court properly evaluated Dr. Jackson's qualifications for purposes of the summary judgment motion.

A.    The District Court Properly Evaluated Dr. Jackson's Qualifications as an Expert on the Nursing Standard of Care.

¶10    To survive a motion for summary judgment, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial" through "affidavits or as otherwise provided" by rule 56 of the Utah Rules of Civil Procedure. Utah R. Civ. P. 56(e); *see also Orvis v. Johnson*, 2008 UT 2, ¶ 18, 177 P.3d 600 (explaining that when the nonmoving party bears the burden of proof at trial, the moving party must show "that there is no genuine issue of material fact" and "[u]pon such a showing, . . . the burden then shifts to the *nonmoving* party who 'may not rest upon the mere allegations or denials of the pleadings,' but 'must set forth specific facts showing that there is a genuine issue for trial'" (quoting Utah R. Civ. P. 56(e))). Specifically, to recover on a claim of medical malpractice, "the plaintiff must produce expert testimony" to show that there is at least an issue of fact regarding whether "the medical professional's negligence proximately caused the plaintiff injury." *Butterfield v. Okubo*, 831 P.2d 97, 102 (Utah 1992).

¶11    In *Butterfield*, the Utah Supreme Court addressed the question of what a plaintiff must include in an expert affidavit with

regard to the underlying data supporting an expert's opinion in order to withstand summary judgment. *Id.* at 102–03. The court ruled that an expert affidavit must contain "specific evidentiary facts" supporting the expert's opinions and cannot "merely reflect[] the affiant's conclusions." *Id.*

> To hold that [the rules of evidence] prevent[] a court from granting summary judgment against a party who relies solely on an expert's opinion that has no more basis in or out of the record than [the plaintiff's expert's] theoretical speculations would seriously undermine the policies of Rule 56 . . . . The position that an expert's opinion that lacks *any* credible support creates an issue of 'fact' is clearly untenable.

*Id.* at 103 (alterations and omission in original) (citation and internal quotation marks omitted). This principle is as applicable to an expert's qualifications as it is to the reliability of the expert's opinion. For example, in *Hubbard v. Wansley*, 2005-CA-01055-SCT, 954 So. 2d 951 (Miss. 2007) (en banc), the Mississippi Supreme Court observed,

> The law empowers a trial judge to determine whether a proffered expert is qualified to testify and does not restrict exercise of this power to the trial stage only. That is, a judge has as much power to resolve doubts on qualifications of proffered experts during the summary judgment stage as he has during the trial stage. And of course, the standard which [the appellate court] must apply when reviewing a trial judge's decision to disqualify remains unchanged—notwithstanding that the decision was made during the summary judgment stage. That is, this Court will determine whether the trial judge abused his discretion.

*Id* ¶ 11.[4] And our supreme court approved a similar approach in *Boice ex rel. Boice v. Marble*, 1999 UT 71, 982 P.2d 565, where it explained that appellate courts afford broad discretion to a district court's ruling on the admissibility of expert testimony, even in the context of a summary judgment ruling. *Id.* ¶¶ 6–7.

¶12　According to De Adder, however, rule 702 of the Utah Rules of Evidence, which was amended in 2007, no longer demands that an expert affidavit contain "specific evidentiary facts" showing the expert's knowledge of the standard of care as required by *Butterfield*. Rather, she contends, rule 702 requires merely a "threshold showing" of reliability. To support her position, De Adder relies on the Utah Supreme Court's decision in *Eskelson ex rel. Eskelson v. Davis Hospital & Medical Center*, 2010 UT 59, 242 P.3d 762, which addresses the amended rule 702.

¶13　In *Eskelson*, the Utah Supreme Court explained that rule 702 "'assigns to trial judges a "gatekeeper" responsibility to screen out unreliable expert testimony.'" *Id.* ¶ 12 (quoting Utah R. Evid. 702 advisory committee note). In its role as a gatekeeper, a trial court should employ a "degree of scrutiny . . . [that] is not so rigorous as to be satisfied only by scientific or other specialized principles or methods that are free of controversy or that meet any fixed set of criteria fashioned to test reliability" but rather should look for "only a 'threshold showing' of reliability." *Id.* (quoting Utah R. Evid. 702(b)–(c)). De Adder asserts that Dr. Jackson's statements that he was familiar with the standard of care and that the nurses' breach of that standard caused De Adder's injury were sufficient to meet this threshold requirement.

---

4. *Hubbard v. Wansley*, 2005-CA-01055-SCT, 954 So. 2d 951 (Miss. 2007) (en banc), addressed the interrelationship between rule 56 of the Mississippi Rules of Civil Procedure and rule 702 of the Mississippi Rules of Evidence, which governs the admissibility of expert testimony. *Id.* ¶¶ 9–13. Mississippi and Utah employ the same standard for granting summary judgment. *Compare* Miss. R. Civ. P. 56(c), *with* Utah R. Civ. P. 56(c). Moreover, Mississippi's evidence rule 702 is virtually identical in substance to Utah's version. *Compare* Miss. R. Evid. 702, *with* Utah R. Evid. 702(a)–(b).

¶14     We disagree. The plaintiff in *Eskelson* sought to introduce the testimony of Dr. Bateman to establish that Dr. Apfelbaum, the emergency room physician who had surgically removed a bead from the plaintiff's son's ear, had performed negligently. *Id.* ¶¶ 2–3. There was no dispute that Dr. Bateman had the "'knowledge, skill, experience, training, or education'" to testify about Dr. Apfelbaum's standard of care. *Id.* ¶ 7 (quoting Utah R. Evid. 702(a)). The district court, however, granted summary judgment to the defendant on the basis that "Dr. Bateman's testimony was not based on any scientific, technical, or other [specialized] knowledge . . . and that his methods were not generally accepted by the relevant scientific community." *Id.* ¶ 4. The supreme court reversed, concluding that because Dr. Bateman had established that he had "experience with the removal of foreign objects from the ears of children" and his opinion was based on facts contained in the record, he had made a threshold showing of the reliability of his expert opinion sufficient to survive summary judgment. *Id.* ¶¶ 15–16.

¶15     Thus, *Eskelson* does not seem to add anything of substance to the analysis of the qualifications issue before us. *See id.*; *see also Butterfield v. Okubo*, 831 P.2d 97, 102–03 (Utah 1992) (explaining that an expert affidavit must contain "specific evidentiary facts" supporting the expert's opinions and cannot "merely reflect[] the affiant's conclusions"). While *Eskelson* specifically addresses the threshold level of evidence on the reliability of an expert's opinions necessary to survive summary judgment, it does not undermine *Butterfield*'s holding that such a threshold showing must be made. Both *Eskelson* and *Butterfield* establish that the proposed expert must present some factual basis to meet the threshold requirements of rule 702. De Adder has not satisfied this threshold burden with regard to the qualifications of Dr. Jackson to testify as to the applicable nursing standard of care.

¶16     In Utah, "a practitioner of one school of medicine is [ordinarily] not competent to testify as an expert in a malpractice action against a practitioner of another school" due to the "wide variation between schools in both precepts and practices." *Dikeou v. Osborn*, 881 P.2d 943, 947 (Utah Ct. App. 1994); *see also* MUJI CV302

(2d. ed. 2011), *available at* http://www.utcourts.gov/resources/muji (requiring that a nurse be shown to have acted with the "same degree of learning, care, and skill ordinarily used by other qualified nurses in good standing providing similar care"). Although Utah appellate courts have not yet addressed the application of this rule to a situation where it is proposed that a doctor testify as to the standard of care for a nurse, the underlying rationale seems to support similar treatment. Rule 702 contemplates the testimony of an expert having "knowledge, skill, experience, training, or education" on the particular subject matter on which he or she intends to opine. Utah R. Evid. 702(a). Nurses receive different training, have different licensing qualifications, and fulfill different functions in patient care than do doctors. *See Sullivan v. Edward Hosp.*, 806 N.E.2d 645, 658–59 (Ill. 2004) ("Physicians often have no first-hand knowledge of nursing practice except for [limited] observations made in patient care settings. The physician rarely, if ever, teaches in a nursing program nor is a physician responsible for content in nursing texts. In many situations, a physician would not be familiar with the standard of care or with nursing policies and procedures which govern the standard of care." (citation and internal quotation marks omitted)); *see also Turner v. University of Utah Hosps.*, 2011 UT App 431, ¶¶ 16–17, 21, 271 P.3d 156 (observing that a doctor's testimony about the nursing standard of care might have been inappropriate because no foundation had been laid under rule 702 to demonstrate that the physician was familiar with the nursing standard of care but ultimately concluding that its admission was harmless), *cert. granted*, 280 P.3d 421 (Utah May 18, 2012) (No. 20120120); MUJI CV302 (2d. ed. 2011). We therefore conclude that a doctor's training as a physician is not sufficient by itself to qualify him or her "to testify as an expert in a malpractice action against" a nurse. *See Dikeou*, 881 P.2d at 947.

¶17    However, there is an exception to the general rule that a physician cannot testify as an expert against another provider who has a different specialty. The exception applies when "a medical expert witness brought in to testify on the applicable standard of care . . . is knowledgeable about the applicable standard of care or [where] the standard of care in the expert's specialty is the same as the standard of care in the alleged negligent doctor's specialty." *Id.*;

*see also, e.g., Creekmore v. Maryview Hosp.*, 662 F.3d 686, 692–93 (4th Cir. 2011) (finding no abuse of discretion where the doctor, who testified about the nursing standard of care, "regularly perform[ed] the procedure at issue . . . and the standard of care for performing the procedure is the same" for doctors and nurses (citation and internal quotation marks omitted)); *Staccato v. Valley Hosp.*, 170 P.3d 503, 504 (Nev. 2007) (per curiam) (stating that a physician is "qualified to testify as to the accepted standard of care for a procedure or treatment [by another health care provider] if the physician's . . . experience, education, and training establish the expertise necessary to perform the procedure or render the treatment at issue"). A natural corollary, however, is that where the physician proffered as an expert lacks the requisite familiarity with the nursing standard of care for a particular procedure and his or her field of expertise does not share a similar standard with the nursing field at issue, the physician's opinions are not admissible. *Pendley v. Southern Reg'l Health Sys., Inc.*, 704 S.E.2d 198, 203 (Ga. Ct. App. 2010) (holding that the court did not abuse its discretion in excluding a physician-expert's testimony on the standard of care for the treating nurse where the doctor "did not train or practice as a nurse, did not train nurses, did not supervise nurses outside of normal nurse–physician interactions, and did not hold himself out to be an expert in nursing or in the standard of care of nurses"); *Simonson v. Keppard*, 225 S.W.3d 868, 873–74 (Tex. App. 2007) (concluding that the district court abused its discretion in allowing the doctor to testify as to the standard of care for a nurse practitioner where the doctor's affidavit showed that he was not familiar with the standard of care).

¶18    Although Dr. Jackson states that he is familiar with the standard of care applicable to the nurses who attended to De Adder, nowhere in his verified expert report or in his deposition[5]

---

5. The record contains only five pages of Dr. Jackson's deposition, which are attached as an exhibit to IHC's reply to De Adder's opposition to the motion for summary judgment. Apparently, upon the parties' stipulation to have the district court review Dr. Jackson's full deposition testimony, the court accepted IHC's copy,

(continued...)

does Dr. Jackson set out any facts that establish that he has either training or experience to support that conclusion or that the applicable nursing standard of care is the same or similar to the standard applicable to his own specialty. *See Butterfield*, 831 P.2d at 102 (requiring an affidavit to be supported with "specific evidentiary facts"). He does not testify that he has worked or trained as a nurse or that he has experience training nurses. Instead, De Adder simply argued to the district court that Dr. Jackson, by virtue of performing the knee surgery, acted as the "captain of the ship," who "knows the functions of each member of the team" and is "in charge of delegating tasks . . . [and] determin[ing] what the proper procedures are." De Adder's "captain of the ship" argument, however, only establishes that Dr. Jackson knows each member of the medical team's general "obligations and duties" to successfully care for the patients and "where one [team member]'s acts stop and the next person['s] begins,"[6] not that he is familiar with the particular standard by which each team member is expected to carry out those obligations and duties.

¶19    Furthermore, Dr. Jackson's report opined, "The standard of care of the attendant hospital personnel requires them to tim[el]y observe and detect malfunctioning, misplacement or any failure of

---

5. (...continued)
which counsel had brought with her to the hearing, and even marked it as exhibit 1 to the hearing. The transcript was apparently then returned to IHC. However, other than the five pages, De Adder has not included the deposition transcript as a part of the record on appeal. *See* Utah R. App. P. 11(a), (c), (e) (explaining the appellant's duty to "take any . . . action necessary to enable the clerk of the trial court to assemble and transmit" to the appellate court the complete record). Therefore, we consider only the excerpts contained within the record.

6.  But, as discussed below, Dr. Jackson did not appear to know whether the nursing staff and the physical therapists had distinct roles in the management of the CPM process or whether (and how) their duties might overlap.

the CPM machine," which includes "diligent monitoring of complaints of pain, discomfort and unusual symptoms." "[H]ad [the nurses] been timely in their attendant observation and interaction with the patient, this prolonged pressure on the nerve while attached to th[e CPM] machine, would not have occurred and Ms. De Adder would not have suffered this injury." Dr. Jackson's report and deposition testimony, however, do not include facts that explain what it means to "tim[el]y observe" or "diligent[ly] monitor[]" the CPM device. For example, Dr. Jackson does not explain how frequently a nurse is required by the applicable standard of care to check the CPM device's operation. Nor does he provide any description of how a nurse following the proper standard should assess whether the patient has been subjected to "prolonged pressure" in the course of treatment with the CPM machine. Indeed, Dr. Jackson acknowledges in his deposition that "I really don't know what the protocol is now" for CPM therapy because "I don't order [the protocol]. I just order CPM," which he acknowledges is "done under the direction of the physical therapy" by "the nurses on the floor." In fact, he explains that his post-operative order for CPM "doesn't say how often it should be on and off the patient" but instead those decisions are "left . . . up to [physical] therapy." And although De Adder argued at the summary judgment hearing that Dr. Jackson merely "misstate[d]" his role when he testified that he simply orders CPM and leaves it to the physical therapists and nurses to perform, when pressed on whether that "misstatement" was ever corrected, De Adder indicated that a formal correction had not been made but that other parts of the deposition supported his claim that he was familiar with the standard of care in operating a CPM device. De Adder then asked for leave to supplement the record with Dr. Jackson's post-operative order and the entire deposition, which the court granted.

¶20    The court subsequently reviewed both the order and the deposition testimony and concluded that "Dr. Jackson fail[ed] to provide the foundational basis whereupon this court can conclude that he is competent to testify as to the standard of care for a nurse" administering CPM. We agree. The post-operative order simply prescribes, "TKA Protocol: CPM to begin day of surgery." And

nowhere in the portion of Dr. Jackson's deposition transcript included in the record (or elsewhere in the record) does he give any indication that the term "TKA Protocol" in his order incorporates or expresses a particular regimen or schedule of therapy. Because De Adder has not included the full deposition transcript on appeal, we presume that the remainder of the deposition testimony supports the district court's conclusion that there was a lack of foundation for Dr. Jackson's testimony on the nursing standard of care. *See Goodman v. Wilkinson*, 629 P.2d 447, 449 (Utah 1981) (explaining that when the record is incomplete on appeal, appellate courts presume the omitted portions support the district court's ruling).

¶21 Thus, the specific facts elicited in Dr. Jackson's deposition testimony substantially undermine the later statement in his expert report that he is familiar with the nursing standard of care for administering CPM therapy. And that conclusory statement, unsupported by facts, cannot create an issue of material fact to survive summary judgment. *See Dairy Prod. Servs., Inc. v. City of Wellsville*, 2000 UT 81, ¶ 54, 13 P.3d 581 ("An affidavit that merely reflects the affiant's unsubstantiated opinions and conclusions is insufficient to create an issue of fact."); *see also Butterfield v. Okubo*, 831 P.2d 97, 103 (Utah 1992) ("The position that an expert's opinion that lacks *any* credible support creates an issue of fact is clearly untenable." (citation and internal quotation marks omitted)).

B.     The District Court Did Not Otherwise Abuse Its Discretion in Precluding Dr. Jackson from Testifying as an Expert.

¶22 De Adder nevertheless claims that the district court erred in granting summary judgment because the court "initiated its own [Utah] Rule [of Evidence] 702 examination" without a motion and in the absence of any briefing on the issue. In support of her claim, De Adder asserts that "[i]t was impossible for [her], in responding to the Motion for Summary Judgment to have predicted that the trial court would . . . unilaterally conduct its own Rule 702 examination based on the summary judgment pleadings" where IHC never "allude[d] to or mention[ed] Rule 702" in its memorandum supporting its motion for summary judgment or

made a "separate motion to strike Dr. Jackson's affidavit or evaluate the same under Rule 702."

¶23    Although the best practice is for parties to identify the rule upon which a motion is based, we are not convinced that "[i]t was impossible for [De Adder]" to "predict[]" that the district court would conduct a rule 702 assessment of Dr. Jackson's qualifications. In the introduction to its summary judgment memorandum, IHC explained that it was entitled to summary judgment because "Dr. Jackson is not qualified to testify regarding the standard of care applicable to [IHC nurses]" and without such an expert, De Adder could not succeed on her negligence claim as a matter of law. In its argument section, IHC sets forth the standard by which a medical professional's expertise to testify about a standard of care is judged and specifically addresses why Dr. Jackson's deposition testimony does not demonstrate that he is qualified. Thus, based on the subject matter of the summary judgment motion and IHC's specific arguments, it was quite clear that Dr. Jackson's qualifications as an expert were at issue. And De Adder, in fact, understood this. In her opposition to the motion for summary judgment, De Adder argued the case for Dr. Jackson's qualification as an expert to testify as to the standard of care expected of the nurses providing CPM therapy. Further, she attached to her opposition memorandum Dr. Jackson's verified expert report, in which he asserted his familiarity with the nurses' standard of care. Though the parties inexplicably omitted specific reference to rule 702, both IHC's arguments and De Adder's response invited the district court to consider Dr. Jackson's qualifications to render an expert opinion under the most directly pertinent authority, rule 702. We therefore conclude that the district court's rule 702 analysis was both appropriate and entirely predictable under the circumstances.

¶24    Furthermore, we cannot agree with De Adder's argument that she was improperly "precluded from seeking a Rule 702 hearing in which to conduct a more detailed examination of Dr. Jackson and other witnesses to meet the burden imposed by the court." In a motion to amend the judgment, filed after the district court's ruling granting summary judgment to IHC, De Adder

asked the court to conduct a rule 702 hearing, at which she would "present [Dr. Jackson] and have him testify." The district court responded that such a hearing seemed both unnecessary and improper. The court reasoned that at the summary judgment stage, an expert affidavit need only contain information that indicates the expert is qualified, and because the affidavit is not subject to cross-examination, its contents are completely within the control of the proffering party and the expert, who can include any information relating to qualifications they deem pertinent. Further, the court expressed concern about holding a hearing "to take evidence" as part of a summary judgment proceeding. The district court's reluctance to conduct such a proceeding seems appropriate where De Adder was aware of the basis for the summary judgment motion and had the unimpeded opportunity to submit her expert's affidavit and any other pertinent evidence. That the affidavit lacked factual support for Dr. Jackson's purported familiarity with the nursing standard of care is a result of De Adder's choices in crafting a response to IHC's motion for summary judgment, and she has not persuaded us that the district court was required to conduct an evidentiary hearing to make up for deficiencies in that response. Rather, holding such a hearing under the circumstances would distort the established summary judgment process and undermine its purposes. *See generally Stevens-Henegar Coll. v. Eagle Gate Coll.*, 2011 UT App 37, ¶ 25, 248 P.3d 1025 ("A major purpose of summary judgment is to avoid unnecessary trial by allowing the parties to pierce the pleadings to determine whether there is a genuine issue to present to the fact finder. In accordance with this purpose, specific facts are required to show whether there is a genuine issue for trial. The allegations of a pleading or factual conclusions on an affidavit are insufficient to raise a genuine issue of fact." (emphasis, citation, and internal quotation marks omitted)). Therefore, the court's decision to deny De Adder's request for an evidentiary hearing was well within its discretion.[7]

_____

7. Because IHC was seeking dismissal of De Adder's claim based on the lack of an expert, it was not necessary for it to file a motion to strike Dr. Jackson's expert report. *Litster v. Utah Valley Cmty. Coll.*, 881 P.2d 933, 936 n.2 (Utah Ct. App. 1994) (explaining that

(continued...)

II. The District Court's Ruling on Summary Judgment

¶25 Finally, we address whether the district court correctly granted summary judgment in favor of IHC. In a medical malpractice case, summary judgment may be granted if a plaintiff fails to present prima facie evidence of "the standard of care by which the [health care provider]'s conduct is to be measured." *Dikeou v. Osborn*, 881 P.2d 943, 946 (Utah Ct. App. 1994) (citation and internal quotation marks omitted); *see also Jensen v. IHC Hosps., Inc.*, 2003 UT 51, ¶ 96, 82 P.3d 1076 ("To prove medical malpractice, a plaintiff must establish (1) the standard of care by which the [health care provider's] conduct is to be measured, (2) breach of that standard by the [provider], (3) injury that was proximately caused by the [provider's] negligence, and (4) damages." (citation and internal quotation marks omitted)). A standard of care must be established by an expert. *Jensen*, 2003 UT 51, ¶ 96. Because we conclude that there was no error in the district court's decision that Dr. Jackson's expert testimony on the standard of care for the nurses providing the CPM therapy was inadmissible, De Adder could not make out a prima facie case of medical malpractice, and summary judgment was proper.

CONCLUSION

¶26 De Adder did not present qualified expert testimony to support her claim of medical negligence. We therefore affirm the grant of summary judgment in favor of IHC.

_____

7. (...continued)

where the "motion for summary judgment alone required the trial court to address whether any affidavits submitted in opposition to the motion" created issues of material fact, a separate motion to strike or an objection to the affidavit itself were not required). Accordingly, IHC's failure to file a motion to strike Dr. Jackson's expert report or affidavit does not provide a basis for reversal, as De Adder claims.