2023 UT App 63

## THE UTAH COURT OF APPEALS

CECILIA HARWARD AND ALVIN HARWARD,
Appellants,
*v.*
UROLOGY CLINIC OF UTAH VALLEY LLC
AND BRANDON REYNOLDS,
Appellees.

Opinion
No. 20220027-CA
Filed June 8, 2023

Fourth District Court, Provo Department
The Honorable Kraig Powell
No. 170401397

G. Eric Nielson and Todd Wahlquist,
Attorneys for Appellants

Stephen W. Owens, James T. Egan, and Nourin
Nahed Abourahma, Attorneys for Appellees

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGES GREGORY K. ORME and RYAN D. TENNEY
concurred.

CHRISTIANSEN FORSTER, Judge:

¶1 As a result of receiving multiple daily infusions of the antibiotic gentamicin, Cecilia Harward developed permanent vestibular damage.[1] She and her husband, Alvin Harward, sued

---

1. The vestibular system is the link between the inner ear and brain that allows us to keep our balance. Damage to this system can cause dizziness and trouble with balance. *See, e.g.,* Stephanie Booth, *What Are Vestibular Disorders?*, WebMD, https://www.web md.com/brain/vestibular-disorders-facts [https://perma.cc/JAT4-

(continued…)

her prescribing urologist, Dr. Brandon Reynolds, and Urology Clinic of Utah Valley LLC (collectively, Dr. Reynolds), asserting that Dr. Reynolds committed medical malpractice by failing to obtain her informed consent prior to ordering that she undergo gentamicin infusions. Following trial, the jury found by special verdict that Dr. Reynolds did not breach his duty of care with respect to Ms. Harward's informed consent. On appeal, we are asked to determine whether the jury instructions, along with statements regarding consent made by witnesses, misled the jury as to the meaning of informed consent. We are also asked to address questions regarding allocation of fault to Ms. Harward and the infusion center nurses.

¶2 We agree with the Harwards that the jury instructions and statements concerning consent had the potential to confuse the jury and that the confusion was reasonably likely to have affected the jury's verdict. We accordingly vacate the verdict and remand for a new trial. We also provide guidance regarding the allocation issues, which may arise on remand.

BACKGROUND

¶3 Ms. Harward's primary physician referred her to Dr. Reynolds because "[s]he had recurrent urinary tract infections that were becoming more and more resistant to antibiotics." Dr. Reynolds found that Ms. Harward also had a kidney stone and scheduled surgery to remove it. Dr. Reynolds also determined that it was necessary to treat Ms. Harward's current infection with antibiotics prior to the surgery to avoid the risk of sepsis. Dr. Reynolds decided that gentamicin would be the most appropriate antibiotic, based on Ms. Harward's circumstances, and instructed his medical assistant to order the antibiotic. Dr. Reynolds did not

7HYH]. Since her gentamicin treatment, Ms. Harward experiences nausea from dizziness, is unable to drive, and frequently needs a cane to walk.

discuss his choice of antibiotic with Ms. Harward. Instead, he had his medical assistant call Ms. Harward and tell her, "Dr. Reynolds wants you to go to the IV infusion center at Utah Valley starting Monday morning for IV antibiotics." The assistant told Ms. Harward she would make the arrangements and that the antibiotic treatment would continue once per day for fourteen days prior to Ms. Harward's surgery but did not give Ms. Harward any details concerning the antibiotic she would receive, its risks, or its alternatives.

¶4    When Ms. Harward arrived at the infusion center, she received a handout concerning gentamicin and signed an acknowledgment (the Acknowledgement) stating, "I have received and understand the instructions in this handout." The handout included a list of side effects, including "loss of balance" and becoming "confused, dizzy, disoriented." It did not specifically mention the risk of permanent vestibular damage.

¶5    When Ms. Harward went to the infusion center for her sixth dose of gentamicin, she complained to the nurse of "dizziness, nausea, dry heaves, [and a] metallic taste" in her mouth. The nurse called Dr. Reynolds, who ordered her to "hold today's dose and restart tomorrow." Based on the nurse's description, Dr. Reynolds did not believe Ms. Harward was having a reaction to the gentamicin, but he told the nurse to call him back if Ms. Harward continued to have problems. Ms. Harward returned for another infusion the next day and received several more doses over the ensuing days. Over the next several days, she told the nurses she was feeling "the same," but the nurses did not report any further symptoms to Dr. Reynolds.

¶6    Ms. Harward ultimately received ten infusions of gentamicin before her surgery. A week later, she followed up with Dr. Reynolds and told him she was concerned she was suffering from "gentamicin poisoning." Dr. Reynolds referred Ms. Harward to an ENT physician, who confirmed that she had

suffered permanent vestibular damage as a consequence of the gentamicin infusions.

¶7      Subsequently, the Harwards sued Dr. Reynolds and the IHC infusion center for medical malpractice based on the failure to obtain Ms. Harward's informed consent to the gentamicin infusions. The Harwards settled their claims against IHC and then proceeded to trial on their claims against Dr. Reynolds.

¶8      Prior to trial, Dr. Reynolds filed a Notice of Apportionment of Fault, stating that he intended to ask that the jury allocate fault to the IHC nurses at trial. However, when he did not designate a nursing expert to testify as to the nursing standard of care, the Harwards filed a motion in limine seeking to prevent him from allocating fault to IHC. The court denied the motion, concluding that Dr. Reynolds's physician experts could opine as to the nursing standard of care in this case and that Dr. Reynolds could, on the basis of this testimony, argue for apportionment of fault.

¶9      Dr. Reynolds filed a motion in limine asking that he be allowed to argue to the jury that IHC paid a settlement to the Harwards. He explained that he wanted to argue that "[i]f a mistake was made, IHC made it and paid out money" and the Harwards "have been compensated for it." The Harwards responded that such an argument would be inappropriate because "[t]here are many reasons why persons settled their dispute" and that Dr. Reynolds should not be able to imply that the settlement with IHC indicated that IHC rather than Dr. Reynolds committed the malpractice. The district court concluded that Dr. Reynolds would not be permitted to make statements or elicit testimony regarding the settlement that went beyond the language of the jury instructions, which informed the jury that the Harwards had settled their claims against IHC and that the jury's award of damages "should be made without considering what they received under this settlement."

¶10 The case proceeded to trial. The Harwards presented evidence that Dr. Reynolds had not told Ms. Harward the name of the drug he was prescribing, that gentamicin had a "black box warning" regarding permanent vestibular damage, or that there were two other medications that could have potentially treated her infection. Their infectious disease expert testified that the risk of vestibular damage from gentamicin is somewhere between 2% and 10% and that gentamicin should be used only in life-threatening situations.

¶11 When cross-examining the Harwards' expert, Dr. Reynolds's counsel referred to the Acknowledgement as a "consent form." The Harwards objected to this reference, but the court overruled that objection. Dr. Reynolds's counsel continued referring to the Acknowledgement as a "consent form" throughout the remainder of the questioning. The Harwards then moved for a mistrial on the ground that mischaracterizing the Acknowledgement as a "consent form" had misled the jury into believing Ms. Harward had given informed consent. At that point, the court took the mistrial motion under advisement and told counsel to, for the rest of the day, refer to the Acknowledgment as "the document that Cecilia Harward signed on . . . March 29, 2016." Subsequently, the district court denied the motion for mistrial, ruling that "the question of whether the form qualifies as a consent form" should be left to the jury and that each side would be able to "vigorously examine and argue" the issue in the remaining four days of trial. In the subsequent days, Dr. Reynolds's defense focused on the issue of consent:

- Dr. Reynolds's counsel continued to refer to the Acknowledgment as a "consent form" over the course of the remaining days of trial.

- Dr. Reynolds's counsel asked Ms. Harward, "[Y]ou understood that at any time you wanted, after Dose 1 or 2 or 3 or any time, you can say, 'Stop. I withdraw my consent to have this drug given to me.' True?" and, "[E]very . . .

time you submitted your arm to an RN, you were consenting to have that . . . shot given?" Ms. Harward answered yes to both questions.

- Dr. Reynolds's counsel asked his urology expert, "Tomorrow morning, this jury's going to get about ten instructions from the judge about what informed consent requires. . . . One of them says, 'Just by showing up, consent is implied.' . . . Does that sound like a good concept?" The expert responded, "Yeah. I agree with that concept." The questioning continued, "After [Ms. Harward] has spoken to her doctor, given a sheet with the risks, talked to the nurse, and puts her arm out, that's consent just itself, isn't it?" The expert again responded, "I think so." Dr. Reynolds's counsel then asked, "Another instruction is that it doesn't even have to be written. So, again, with no writing, there['s] consent, informed consent. Do you agree?" The expert responded, "I agree."

- Dr. Reynolds's counsel also asked the same urology expert, "[D]o you believe this form complies with the appropriate standards of care for consent for gentamicin?" And the expert replied, "Yes, I do. I think it's quite good, actually."

¶12 Another subject of questioning at trial concerned apportionment of fault, both to Ms. Harward and to the IHC nurses. First, Dr. Reynolds's counsel asked his ENT expert, "[W]ould you estimate for me, what percentage of [Ms. Harward's] failure to follow through with vestibular therapy has contributed to her ability to deal with her vestibular problems?" The expert responded that he believed Ms. Harward's share of responsibility was "50 percent." Second, Dr. Reynolds's counsel elicited testimony from Ms. Harward that she and her husband had received a settlement from IHC and testimony from Dr. Reynolds's urology expert indicating that he was aware the Harwards had settled with IHC.

¶13 The jury was sent to deliberate, and the court provided a special verdict form asking the jury to answer several questions, the first of which was, "Did Brandon Reynolds, M.D./Urology Clinic of Utah Valley breach the standard of care in treating Cecilia Harward?" As to this question, the court instructed the jury: "A physician has a duty to obtain the patient's informed consent to proposed care. Consent is informed if the patient gives consent after the physician outlines the substantial and significant risks of serious harm from the care and the reasonable alternatives to care." It further outlined the elements of informed consent:

> (1) that a physician-patient relationship existed between (a) Cecilia Harward and (b) Brandon Reynolds, M.D./Urology Clinic of Utah Valley;
>
> (2) that Brandon Reynolds, M.D./Urology Clinic of Utah Valley provided care to Cecilia Harward;
>
> (3) that Cecilia Harward suffered personal injuries arising out of the care rendered;
>
> (4) that the care posed a substantial and significant risk of causing serious harm;
>
> (5) that Cecilia Harward was not informed of the substantial and significant risk or of reasonable alternatives;
>
> (6) that a reasonable person in Cecilia Harward's position would not have consented to the care after having been informed of the substantial and significant risks and alternatives; and
>
> (7) that the care was a cause of Cecilia Harward's harm.

However, over the Harwards' objection, the district court then added two instructions concerning consent: (1) "When a person submits to health care rendered by a health care provider, it is presumed that actions taken by the health care provider are either expressly or impliedly authorized to be done," and (2) "A consent to treatment is binding even if it is not in writing."

¶14    The jury returned a verdict in favor of Dr. Reynolds by answering "no" to the first question on the special verdict form, finding that Dr. Reynolds did not breach his standard of care. The Harwards now appeal.

ISSUES AND STANDARDS OF REVIEW

¶15    The Harwards first assert that the district court erred in overruling their objection to the jury instructions on consent. Whether a jury instruction correctly states the law is a matter reviewed for correctness. *Zazzetti v. Prestige Senior Living Center LLC*, 2022 UT App 42, ¶ 15, 509 P.3d 776, *cert. denied*, 525 P.3d 1260 (Utah 2022). However, the question of whether a district court could or should refuse to give a jury instruction is reviewed for abuse of discretion. *Miller v. Utah Dep't of Transp.*, 2012 UT 54, ¶ 13, 285 P.3d 1208.

¶16    They next argue that the district court erred by denying their motion for mistrial. They relatedly assert that the district court should have ruled as a matter of law that the Acknowledgment was not a consent form and precluded Dr. Reynolds from characterizing it as such throughout the remainder of trial. "A trial court's decision to grant or deny a mistrial will not be disturbed on appeal absent an abuse of discretion." *West Valley City v. Patten*, 1999 UT App 149, ¶ 7, 981 P.2d 420. "We grant a trial court broad discretion to admit or exclude evidence and will disturb its ruling only for abuse of discretion," which may be "demonstrated by showing that the district court relied on an erroneous conclusion of law or that there was no evidentiary basis

for the trial court's ruling." *Daniels v. Gamma West Brachytherapy, LLC*, 2009 UT 66, ¶ 32, 221 P.3d 256 (quotation simplified).

¶17 The Harwards also argue that the district court erred in allowing Dr. Reynolds to introduce evidence of the settlement with IHC in the context of discussing the IHC nurses' liability. We also review this issue for abuse of discretion. *See id.*

¶18 The Harwards next assert that the district court erred in allowing Dr. Reynolds to elicit testimony regarding the consent instructions and Ms. Harward's percentage of fault. We review the district court's determinations concerning the admissibility of expert testimony for abuse of discretion. *See Steffensen v. Smith's Mgmt. Corp.*, 862 P.2d 1342, 1347 (Utah 1993).

¶19 Finally, the Harwards argue that the court erred in allowing Dr. Reynolds to question the physician experts about the nursing standard of care. Again, we review the admissibility of expert testimony for abuse of discretion.[2] *See id.*

## ANALYSIS

### I. Jury Instructions

¶20 "[T]he object of instructions is to enlighten the jury." *Nielsen v. Pioneer Valley Hosp.*, 830 P.2d 270, 275 (Utah 1992). "It is the duty of the trial court to cover the theories and points of law of both parties in its instructions, provided there is competent evidence to support them." *Miller v. Utah Dep't of Transp.*, 2012 UT 54, ¶ 13, 285 P.3d 1208 (quotation simplified). However, "the trial

---

2. Dr. Reynolds argues that many of these issues were unpreserved. However, Dr. Reynolds's arguments misconstrue our preservation rules. We identify no real concerns with preservation in this case and consider the Harwards' arguments on their merits.

court may"—and should—"properly refuse to give requested instructions where [they do] not accurately reflect the law governing the factual situation of the case." *See id.* (quotation simplified); *see also Black v. McKnight*, 562 P.2d 621, 622 (Utah 1977) (upholding a court's refusal to include statutory language in the jury instructions that had no relationship to the facts presented in the case). Indeed, even instructions that are correct as a matter of law may be inappropriate when they "create[] the potential for confusion and could have misled the jury." *State v. Hutchings*, 2012 UT 50, ¶ 23, 285 P.3d 1183.

¶21 Our supreme court's decision in *Nielsen v. Pioneer Valley Hospital*, 830 P.2d 270 (Utah 1992), is instructive. In *Nielsen*, a plaintiff brought a medical malpractice claim in which she raised theories of both res ipsa loquitur and common law negligence. *See id.* at 272. The court's jury instructions on res ipsa loquitur explained that the jury did not need to rely on expert testimony if the elements of res ipsa loquitur were established and that the existence of those elements would create "an inference of negligence" that the defendants would have to rebut. *Id.* at 272–73 (quotation simplified). However, the court also gave instructions on common law negligence, which stated that "no presumption of negligence arises from the fact of an adverse event occurring during a defendant's treatment" and that the jury could not impose any "standard derived from [its] own experience." *Id.* at 273 (quotation simplified). But the court did not explain to the jury that the common law negligence instructions did not apply to the res ipsa loquitur claim. *Id.* at 274.

¶22 Our supreme court determined that the common law negligence instructions were misleading because they did "not distinguish between the two separate theories of negligence" and therefore were likely to have denied the plaintiff a fair trial. *Id.* The court explained, "While lawyers and judges with a background in negligence law may be able to discern which instructions apply to which theories, we are not satisfied that a lay jury could do so." *Id.*

¶23    The same is true here. Like res ipsa loquitur and common law negligence, the concepts of "consent" and "informed consent" are distinct, *see Lounsbury v. Capel*, 836 P.2d 188, 193 (Utah Ct. App. 1992), *cert. denied*, 843 P.2d 1042 (Utah 1992), yet that distinction is not readily apparent to a lay jury, *see Nielsen*, 830 P.2d at 274.

¶24    As the jury instructions indicated, "When a person submits to health care rendered by a health care provider, it is presumed that actions taken by the health care provider are either expressly or impliedly authorized to be done." *See* Utah Code § 78B-3-406(1)(a). Nevertheless, a patient may show a lack of informed consent by demonstrating, among other things, that the patient was not informed of "a substantial and significant risk" before submitting to the healthcare. *See id.* § 78B-3-406(1)(b). Thus, a person may consent to the actions of a healthcare provider without giving *informed* consent.

¶25    However, this distinction would not necessarily be apparent to a lay juror, particularly one confronted with the evidence presented in this trial. First, the terms "consent" and "informed consent" are very similar. A juror confronted with a question about informed consent may very well not realize that an instruction concerning consent could not negate the informed consent requirements unless the difference was adequately explained in the jury instructions. Moreover, the jury in this case was presented with extensive testimony concerning "consent," despite consent not being an issue in the case. Dr. Reynolds's questions both to Ms. Harward and his expert regarding whether Ms. Harward gave consent by "showing up" and submitting her arm for an injection very well could have given the jury the impression that these actions were, in fact, relevant to the case and that it should consider them in assessing the Harwards' informed consent claim.

¶26    Similar to what happened in *Nielsen*, the jury in this case was presented with instructions relating to both consent and

informed consent without any indication that the "consent" instructions did not impact Ms. Harward's informed consent claim. In fact, the error is even more egregious here than in *Nielsen*. Unlike the plaintiff in *Nielsen*, who argued theories of both res ipsa loquitur and common law negligence—making instructions on both necessary—the Harwards never asserted that Ms. Harward had not consented to the treatment, instead asserting only that she did not give her informed consent. Thus, there was no reason for the jury to consider whether Ms. Harward consented to the treatment or to apply the presumption of consent, and there was no reason for the district court to include the consent instruction. Under these circumstances, it was an abuse of the district court's discretion to give the requested consent instruction.

¶27 The instruction that consent need not be in writing was similarly unnecessary because consent was not in dispute. This instruction, combined with the consent instruction, had the potential to mislead the jury into believing that Ms. Harward's nonverbal action of presenting at the infusion center and submitting to treatment was sufficient to establish that she gave informed consent to receive gentamicin.

¶28 We view the "potential for confusion" created by the jury instructions to have been sufficiently "substantial" to give rise to "a reasonable likelihood that the jury's verdict may have been different absent the error." *See Nielsen*, 830 P.2d at 275. And that view is further strengthened by our recognition of additional errors exacerbating the potential for confusion, which we address in subsequent sections of this opinion.

## II. The Acknowledgment

¶29 The Harwards raise three separate arguments relating to the district court's handling of the Acknowledgment. First, they argue that the court should have granted their motion for mistrial based on Dr. Reynolds's characterization of the Acknowledgment

as a consent form to the jury. Second, they argue that the court should have given a curative instruction informing the jury that the Acknowledgment did not meet the statutory requirements of a written informed consent as a matter of law. Third, they argue that the court should have precluded Dr. Reynolds from continuing to characterize the Acknowledgment as a consent form throughout the rest of the trial.

¶30    Trial courts have broad discretion in deciding whether to grant a mistrial. Whether Dr. Reynolds's initial references to the Acknowledgment as a consent form, alone, would have required a mistrial had the district court prevented further references, we need not decide in light of our reversal on other grounds. However, to guide the district court on remand, we address the questions of whether the court should have instructed the jury that the Acknowledgment was not a written consent and whether the court should have allowed it to be characterized as a consent form.

¶31    The Utah Code indicates that a written consent meeting specific requirements and executed by the patient or their representative is a defense to an alleged failure to obtain informed consent. Utah Code § 78B-3-406(3)(e). To rebut this defense, the plaintiff must then prove a lack of capacity or fraud. *Id.* § 78B-3-406(4). Dr. Reynolds does not argue that the Acknowledgment met the requirements of this statute. Moreover, he did not raise such a defense at trial.

¶32    As a general matter, there was no reason for the court to rule on whether the Acknowledgement was a written consent or to include a jury instruction to that effect because Dr. Reynolds did not assert a defense based on the existence of a written consent and the jury was not instructed regarding the effect of such a document. And just because the Acknowledgement did not meet the statutory requirements of a written consent form did not mean that it could not be used as evidence that Ms. Harward was informed of at least some of the risks of gentamicin.

¶33    However, we do think it was inappropriate for Dr. Reynolds to repeatedly characterize the Acknowledgement as a "consent form" given the potential confusion we have identified between the concepts of consent and informed consent. Rather than focusing on whether the Acknowledgement provided Ms. Harward with sufficient information to make her consent informed, Dr. Reynolds implied that Ms. Harward gave her informed consent simply by signing the form. For example, he elicited expert testimony that the Acknowledgement "complies with the appropriate standards of care for *consent* for gentamicin." (Emphasis added.) And in his closing argument, he asserted that Ms. Harward had "signed" a document that was "better than a general surgical consent form" even though consent requires no document. These statements, coupled with the repeated reference to the Acknowledgement as a "consent form" throughout trial, implied that the Acknowledgement was more than it was. And this implication was exacerbated by the confusing jury instructions on consent discussed above.

¶34    The potential negative effects of Dr. Reynolds's references to the Acknowledgement as a consent form could have been ameliorated had the court either provided a curative instruction or precluded Dr. Reynolds from continuing to characterize the Acknowledgement as a consent form. The fact that the court did neither of these things further solidifies our conviction that the Harwards did not receive a fair trial.

### III. Settlement Evidence

¶35    The Harwards also assert that the court erred in permitting statements and questioning regarding their pretrial settlement with IHC. Rule 408 of the Utah Rules of Evidence prohibits the use of settlement evidence "to prove or disprove liability," but such evidence may be used "for another purpose." Utah R. Evid. 408. In this case, Dr. Reynolds was permitted to argue for allocation of fault to IHC as another potentially liable party. The court found it appropriate to inform the jury that IHC had settled

to explain IHC's absence from the trial. However, the district court ruled that the parties would not be permitted to argue "that IHC paid money to be dismissed" or to discuss "the settlement other than to reference the exact wording of the jury instructions." The Harwards do not take issue with this ruling but assert that the court allowed Dr. Reynolds to violate it on several occasions.

¶36   Because we are remanding for a new trial, we need not examine the challenged violations in detail. We nevertheless caution that in the course of the new trial, the district court should take care to prohibit questioning about the settlement that implies a link between the settlement and liability.

### IV. Expert Statements

A.   Expert Testimony Regarding the Jury Instructions

¶37   The Harwards next take issue with the district court's decision to allow Dr. Reynolds to question his urology expert regarding his opinions of the jury instructions. Dr. Reynolds's counsel asked, "Tomorrow morning, this jury's going to get about ten instructions from the judge about what informed consent requires. . . . One of them says, 'Just by showing up, consent is implied.' . . . Does that sound like a good concept?" The expert responded, "Yeah. I agree with that concept." Dr. Reynolds's counsel went on to ask, "Another instruction is that it doesn't even have to be written. So, again, with no writing, there['s] consent, informed consent. Do you agree?" The expert responded, "I agree."

¶38   The Utah Rules of Evidence permit an expert witness to "testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Utah R. Evid. 702(a). However, "an expert witness exceeds the scope of permissible testimony when the witness's legal conclusions blur the separate and distinct responsibilities of the

judge, jury and witness, or there is danger that a juror may turn to the witness's legal conclusion rather than the judge for guidance on the applicable law." *State v. Chapman*, 2014 UT App 255, ¶ 17, 338 P.3d 230 (quotation simplified), *cert. denied*, 343 P.3d 708 (Utah 2015); *accord Steffensen v. Smith's Mgmt. Corp.*, 862 P.2d 1342, 1347–48 (Utah 1993).

¶39    We agree with the Harwards that the urology expert's testimony regarding the jury instructions exceeded the scope of permissible expert testimony. Whether the expert agreed with a legal standard outlined in the jury instructions was irrelevant to the correctness of those instructions, and the expert's opinion created a danger of the jurors relying on the expert rather than the judge for guidance on the law and the meaning of the instructions. Moreover, the question to the expert explicitly suggested that the consent instruction was an instruction about "what *informed consent* requires." (Emphasis added.) This was particularly misleading because the instruction was not about informed consent. The urology expert's testimony that he agreed with the unnecessary consent instructions and the context in which that testimony was elicited increased the likelihood that the jury was misled by the instructions.

B.    Expert Testimony Regarding Comparative Fault

¶40    The Harwards also take issue with the testimony from Dr. Reynolds's ENT expert in which he provided his opinion that Ms. Harward's share of fault was "50 percent." Ultimately, this testimony did not impact the outcome of the case because the jury never reached the questions on the special verdict form concerning apportionment. However, we observe, for the court's benefit on remand, that such testimony is inappropriate. *See generally Steffensen*, 862 P.2d at 1348 (explaining that "apportionment of negligence" is "exclusively the jury's responsibility" and that it is therefore inappropriate for an expert witness to opine on "the actual percentage of negligence" between two parties); *see also Webb v. Omni Block, Inc.*, 166 P.3d 140, 145–46

(Ariz. Ct. App. 2007) (holding that an expert made "inadmissible legal conclusions" when he attributed specific percentages of fault to different parties because "he thereby told the jury how to decide the case").

## V. Allocation of Fault

¶41 Finally, the Harwards challenge the district court's decision to allow Dr. Reynolds to use physician experts to testify to the nursing standard of care. This decision ultimately did not affect the outcome of the case because the jury never reached the allocation issue on the special verdict form. However, as the issue is likely to arise on remand, we elect to address it. *See, e.g.*, *Miller v. Utah Dep't of Transp.*, 2012 UT 54, ¶ 21, 285 P.3d 1208; *State v. Low*, 2008 UT 58, ¶ 61, 192 P.3d 867.

¶42 "In Utah, a practitioner of one school of medicine is ordinarily not competent to testify as an expert in a malpractice action against a practitioner of another school due to the wide variation between schools in both precepts and practices." *De Adder v. Intermountain Healthcare, Inc.*, 2013 UT App 173, ¶ 16, 308 P.3d 543 (quotation simplified). Thus, doctors are typically not qualified "to testify as an expert in a malpractice action against a nurse." *Id.* (quotation simplified). However, an "exception applies when a medical expert witness . . . is knowledgeable about the applicable standard of care" in the relevant field or the standard of care "is the same" as the standard of care in the expert's specialty. *Id.* ¶ 17 (quotation simplified).

¶43 In this case, the nurses' alleged breach of duty was their handling of Ms. Harward's initial reports of side effects. The district court explained that the question of whether the nurses were negligent in this case "depends on ultimately what and when they needed to report to the doctor." The court determined that the doctor would be "knowledgeable about the applicable standard of care" because "the doctor would know whether or when to call the doctor." We agree with this assessment. Thus, the

district court did not err in permitting the physician experts to testify regarding the nursing standard of care in this case.[3]

## CONCLUSION

¶44 Under the circumstances of this case, the jury instructions on general consent and whether consent must be in writing were potentially misleading to the jury. The potential for confusion was further exacerbated by the defense's repeated characterization of the Acknowledgment as a "consent form" and the testimony of the urology expert regarding his approval of the instructions. We also observe that the ENT expert should not have opined as to Ms. Harward's percentage of fault and that the defense may have gone too far in questioning the urology expert about the settlement agreement. The district court did not err, however, in permitting the physician experts to testify to the nursing standard of care under the circumstances of this case.

¶45 We vacate the jury's verdict and remand for a new trial.

─────────────

3. As part of their argument, the Harwards point out that Dr. Reynolds was permitted to question their experts regarding the nursing standard of care, putting them in the difficult position of having to impeach their own experts. Their argument seems to imply that even if Dr. Reynolds could rely on his physician experts to establish the nursing standard of care, he should not have been permitted to establish the standard of care through the Harwards' experts. However, the Harwards do not provide any support for this assertion apart from their general argument that the physician experts were not qualified to opine on the nursing standard of care. If there is some other basis for limiting defense questioning of the Harwards' experts, the Harwards can raise it during the new trial.